William F. "Chip" Merlin, Jr.
CA Bar No. 275936
cmerlin@merlinlawgroup.com
**MERLIN LAW GROUP**
777 S. Harbour Island Blvd.,
Suite 950
Tampa, FL 33602
Telephone: (813) 229-1000
Facsimile: (813) 229-3692

Victor J. Jacobellis
CA Bar No. 278988
vjacobellis@merlinlawgroup.com
Daniel J. Veroff
CA Bar No. 291492
dveroff@merlinlawgroup.com
**MERLIN LAW GROUP**
1160 Battery St East, Suite 100
San Francisco, CA 94111
Telephone: (415) 851-2300
Facsimile: (415) 960-3882

Adam M. Moskowitz
(*to be admitted Pro Hac Vice*)
adam@moskowitz-law.com
Adam A. Schwartzbaum
(*to be admitted Pro Hac Vice*)
adams@moskowitz-law.com
Howard Bushman
(*to be admitted Pro Hac Vice*)
howard@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Tel: (305) 479-5508

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN BAKER AND MELANIA KANG D/B/A CHLOE'S CAFE, a California general partnership, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>OREGON MUTUAL INSURANCE COMPANY, an Oregon Corporation,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL**<br><br>1. Declaratory Judgment – Business Income Coverage<br>2. Declaratory Judgment – Civil Authority Coverage<br>3. Declaratory Judgment – Extra Expense Coverage<br>4. Declaratory Judgment – Business Income From Dependent Properties Coverage |

**CLASS ACTION COMPLAINT**

Plaintiff, Steven Baker and Melania Kang d/b/a Chloe's Cafe (together, "Chloe's Café" or "Plaintiff"), by and through its undersigned attorneys, brings this action on behalf of themselves and all others similarly situated against Defendant Oregon Mutual Insurance Company ("Oregon Mutual" or "Defendant"):

**INTRODUCTION**

1.      This is a class action brought by Plaintiff Chloe's Cafe against Defendant Oregon Mutual, related to insurance policies that insure Plaintiff's properties, business operations, and potential liability in connection with Plaintiff's business operations. These insurance policies include Business Income coverage, Extra Expense coverage, coverage for loss due to the actions of a Civil Authority, and Business Income and Business Income from Dependent Properties coverage, but do not contain any exclusions for viruses such as COVID-19.

2.      Plaintiff is a small business that purchased Oregon Mutual's insurance policy and made premium payments for a policy that, in the event of a catastrophe requiring a shutdown of business operations, would require Oregon Mutual's to honor its contractual obligation to provide coverage. In March 2020, such a catastrophe took place when Plaintiff was forced to close its retail businesses due to the COVID-19 pandemic. All across the country, including in San Francisco, California, government authorities issued closure orders to retail establishments, including the business operated by Chloe's Cafe, in an effort to stop the rapid spread of the deadly COVID-19 virus. Orders from Civil Authorities requiring businesses to close have resulted in massive losses to businesses throughout the country. As a result, many insureds, including Plaintiff, filed claims for Business Income coverage, Extra Expense coverage, coverage for losses due to the actions of a Civil Authority, and Business Income from Dependent Properties.

3.      In response to the business interruption claims filed by Plaintiff and thousands of other class members resulting from the COVID-19 pandemic, Defendant Oregon Mutual has systematically denied and continues to deny and refuses to provide payment for insurance claims for coverage for similar losses and expenses by insureds holding policies that are, in all material respects, identical. Defendant's decision to not provide coverage and/or its decision to

refuse to pay claims under the common policy forms issued to Plaintiff and the putative class members constitutes a breach of contract and provides them with the right to seek a declaratory judgment pursuant to 28 U.S.C. § 2201(a) on behalf of itself and the class members establishing that they are entitled to receive the benefit of the insurance coverage it purchased and for indemnification of the businesses losses it has sustained.

**PARTIES, JURISDICTION AND VENUE**

4.      Steven Baker and Melania Kang are co-owners of a small business, "Chloe's Café," located in San Francisco, California, organized under the laws of California as a general partnership, with a principal place of business in San Francisco, California. Both Baker and Kang are residents of San Francisco, California.

5.      Defendant Oregon Mutual is an Oregon business corporation with its principal place of business in McMinnville, Oregon. Oregon Mutual Insurance is an insurance company engaged in the business of selling insurance contracts to commercial entities such as Plaintiff in California and across the country.

6.      At all times material, Oregon Mutual engaged in substantial and not isolated activity on a continuous and systematic basis in the state of California by issuing and selling insurance policies in California and by contracting to insure property located in California.

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because it involves citizens of different states and the amount in controversy exceeds $75,000.

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because there is diversity between Defendant and at least one member of each class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000 exclusive of interest and costs. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

9.      Venue is proper in the San Francisco Division of this District to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claim occurred in this District and/or a substantial party of the property that is the subject of the action

1    is situated in this District.

2        10.    This Court has personal jurisdiction over Defendant because Plaintiff's claims

3    arise out of, among other things, Defendant conducting, engaging in, and/or carrying on

4    business in California; Defendant breaching a contract in this state by failing to perform acts

5    required by contract to be performed in this state; and Defendant contracting to insure property

6    in California. Defendant also purposefully availed themselves of the opportunity of conducting

7    activities in the state of California by marketing its insurance policies and services within the

8    state, and intentionally developing relationships with brokers, agents, and customers within the

9    state to insure property within the state, all of which resulted in the policy at issue in this action.

10    **BACKGROUND**

11    **A.  Insurance Coverage**

12        11.    On August 1, 2019, Chloe's Cafe obtained a property insurance policy issued

13    and underwritten by the Defendant. the insured premises under the policy is 1399 Church Street,

14    San Francisco, CA 94114-3924 (the "Policy"). A copy of the Chloe's Cafe Policy is attached as

15    Exhibit A.

16        12.    The Policy uses standard common forms that contain the same and/or

17    substantially similar provisions at issue in this action as those issued by Oregon Mutual to the

18    members of the putative class as defined herein.

19        13.    The Policy is an all-risk insurance policy. In an all-risk insurance policy, all risks

20    of loss are covered unless they are specifically excluded.

21        14.    In accordance with the all-risk nature of the Policy, Oregon Mutual agreed to pay

22    for all losses caused by a "Covered Cause of Loss."

23        15.    The Policy provides "Business Income" coverage, pursuant to which Defendant

24    will pay certain amounts "for the actual loss of Business Income you sustain due to the

25    necessary suspension of your 'operations' during the 'period of restoration.' The suspension

26    must be caused by direct physical loss of or damage to property at the described premises."

27        16.    The Policy also provided to "Extended Business Income" under certain

28    circumstances when there is a loss of Business Income.

17.    The Policy also provides "Extra Expense" coverage, pursuant to which Defendant will pay "necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused at the described premises."

18.    The terms of the Policy also provide the insured with insurance coverage for Business Income, along with any necessary extra expenses incurred, when access to the Insured's properties is specifically prohibited by Civil Authority Orders. This additional coverage is identified as coverage under "Civil Authority" and states that Defendant "will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direcly physical loss or damage to property."

19.    The Civil Authority coverage is an independent basis for business interruption coverage that can be triggered even when the standard business interruption coverage is not.

20.    The Policy also provided coverage for "Business Income From Dependent Properties," pursuant to which Defendant "will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent prioperty caused by or resulting from any Covered Cause of Loss."

21.    Defendant's standardized language in the Policy regarding coverage for loss of Business Income coverage, Extra Expenses coverage, coverage for loss due to the actions of a Civil Authority, and Business Income From Dependent Properties Coverage, is present in every policy issued by Oregon Mutual Insurance to Plaintiff and the putative class members that provides coverage for Business Income, Extra Expenses, coverage for loss due to the actions of a Civil Authority, and Business Income From Depedent Properties.

22.    The Policy utilizes, in part, policy forms and language published by the Insurance Services Office, Inc. ("ISO"), which publishes policy forms for use by the insurance industry—as evidenced by the ISO copyright designation at the bottom of some pages of the Policy.

**CLASS ACTION COMPLAINT**

23.     Despite the fact that, prior to the effective date of the Policy, ISO published and made available for use a standard virus exclusion form, Oregon Mutual chose *not* to include the ISO standard virus exclusion form in the Policy. Indeed, the word "virus" only appears in the policy when discussing computer viruses.

24.     The Policy does not contain any exclusion which would apply to allow Defendant OREGON MUTUAL to completely deny coverage for losses caused by COVID-19 and related actions of civil authorities taken in response to COVID-19.

25.     Because the Policy is an all-risk policy and does not exclude Plaintiff's losses, Plaintiff's losses are covered up to the applicable limits of insurance.

**B. The COVID-19 Pandemic**

26.     COVID-19 is a novel coronavirus that originated in Wuhan, China at the end of 2019 and rapidly spread around the world, infecting millions of people, including over 2.15 million Americans. Over 150,000 Americans died due to COVID-19.

27.     COVID-19 is a physical substance that can cause lethal illness. COVID-19 can be present outside the body in viral fluid particles. COVID-19 is highly contagious and easily communicable through droplets in the air and on surfaces.

28.     The scientific community, and those personally affected by the virus, recognize COVID-19 as a cause of real physical loss and damage. Contamination of the Insured Property would be a direct physical loss requiring remediation to clean the surfaces within the Insured Property.

29.     COVID-19 remains capable of being transmitted on a variety of inert physical surfaces for various periods of time. For example, reports issued by the National Institute of Health ("NIH") indicates that COVID-19 remains stable and transmittable in airborne aerosols for up to three hours, on copper for up to four hours, on cardboard for up to 24 hours, and on plastic and stainless steel for up to two to three days. Moreover, the COVID-19 pandemic has been exacerbated by the fact that the virus physically infects and stays on surfaces of some objects or materials for up to 28 days.

**CLASS ACTION COMPLAINT**

30.     The Center for Disease Control ("CDC") issued guidance recommending people not to gather in groups larger than 10. Pursuant to CDC guidelines, people face increased danger of contracting COVID-19 in places where people congregate and are in close proximity to one another, and especially in indoor environments.

31.     COVID-19 has been transmitted in a variety of ways, including transmission (a) by way of human contract with surfaces and items of physical property; (b) by human to human contact and interaction, including places like bars and restaurants, retail stores, and hair and beauty salons, and the like; and (c) through airborne particles emitted into the air and even recirculated through air conditioning units.

32.     The presence of COVID-19 particles renders physical property unsafe and impairs its value, usefulness, and/or normal function, causing direct physical harm to property and resulting in direct physical loss and physical damage to property.

33.     The presence of COVID-19 particles and/or the presence of persons infected with COVID-19 or carrying COVID-19 particles at premises renders the premises unsafe, thereby impairing the premises' value, usefulness, and/or normal function, and resulting in direct physical loss to and of the premises and property.

**C.  The Covered Cause of Loss**

34.     The presence of COVID-19 has caused civil authorities throughout the country to issue order requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiff's business (the "Closure Orders").

35.     As of the date this complaint is filed, California had over 492,000 confirmed COVID-19 cases, and over 8,633 deaths.

36.     In response to the public health emergency caused by the COVID-19 pandemic, civil authorities across the United States, including the civil authorities with jurisdiction over Plaintiff in California, have issued Closure Order restricting and prohibiting access to Plaintiff's insured property and the insured properties of other putative class members.

37.     On March 4, 2020, Governor Newsom of the State of California proclaimed the existence of a disaster emergency in the State of California due to the COVID-19 pandemic.

**CLASS ACTION COMPLAINT**

38.     Notably, on March 19, 2020, California Governor Newsom issued Executive Order N033-20, which ordered all individuals living in the State of California to stay at home or at their place of residence, except as needed to maintain continuity of operations of the federal critical infrastructure sectors as defined in the Order.

39.     Governor Newsom's "Stay At Home" orders, like other similar orders entered by Civil Authorities across the United States, were partially entered to stop physical damage and physical loss of property caused by COVID-19's presence.

40.     State courts such as the Pennsylvania Supreme Court have already entered rulings adopting Plaintiff's position that physical loss and damage exists resulting in coverage here. *See Friends of DeVito, et. al v. Wolf*, No. 68 MM 2020 (Pa. April 13, 2020). Furthermore, orders issued in states such as New York, Colorado, Washington, Indiana, New Mexico, North Carolina, Missouri, and Illinois have all recognized that COVID-19 poses a specific threat to property and can cause property loss and damage.

41.     Additionally, in San Francisco, Mayor London Breed entered an order on April 30, 2020, indicating that that emergency order "and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also *because **the virus is causing property loss or damage** due to its proclivity to attach to surfaces for prolonged periods of time.*"

42.     The Mayor the City of Los Angeles entered a similar order on March 19, 2020, ordering people to stay at home and explaining that the "Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person *and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time.*"

43.     The Closure Orders issued by California authorities covering California non-essential businesses (such as Plaintiff's) are similar to Closure Orders that have been issued nationwide by state and local civil authorities.

44.     The presence of COVID-19 caused direct physical loss of and/or damage to the Insured Property under the Policy by, among other things, damaging the property, denying

**CLASS ACTION COMPLAINT**

access to the property, preventing customers and patients from physically occupying the property, causing the property to be physically uninhabitable by customers and patients, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

45.    The Closure Orders of civil authorities prohibited access to Plaintiff and other class members' Insured Properties, and the areas immediately surrounding the Insured Properties, in response to dangerous physical conditions resulting from a covered cause of loss.

46.    As a result of the presence of COVID-19 and the Closure Orders, Plaintiff and other class members sustained a suspension of business operations, sustained losses of business income, and incurred extra expenses. Plaintiff has also sustained business income losses due to direct physical loss or physical damage at the premises of dependent properties.

47.    Plaintiff's losses and expenses have continued through the date of filing this action.

48.    Plaintiff's losses and expenses are not excluded from coverage under the Policy. Because the Policy is an all-risk policy and Plaintiff has complied with its contractual obligations, Plaintiff is entitled to payment for these losses and expenses.

49.    Consistent with the terms and procedures of the Policy, Plaintiff submitted a claim for loss to Defendant under the Policy due to the presence of COVID-19 and the shutdown Civil Authority orders.

50.    In violation of the Policy's plain language and its own contractual obligations, Oregon Mutual denied Plaintiff's claim and refuses to pay for Plaintiff's losses and expenses.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

///

52.    Plaintiff seeks to represent nationwide classes defined as:

    a.   All persons and entities with Business Income coverage under a property insurance policy issued by Oregon Mutual that suffered a suspension of business due to COVID-19 at the premises covered by the business income coverage (the "Business Income Declaratory Judgment Class").

    b.   All persons and entities with Civil Authority coverage under a property insurance policy issued by Oregon Mutual that suffered loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Declaratory Judgment Class").

    c.   All persons and entities with Extra Expense coverage under a property insurance policy issued by Oregon Mutual that sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Oregon Mutual property insurance policy (the "Extra Expense Declaratory Judgment Class").

    d.   All persons and entities with Business Income and Business Income from Dependent Properties coverage under a property insurance policy issued by Defendant that suffered an actual loss of Business Income caused by direct physical loss or physical damage at a dependent property or properties ("the Dependent Property Business Interruption Declaratory Judgment Class").

53.    Excluded from each defined Class is Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiff reserves the right to modify or amend each of the Class definitions, as appropriate, during the course of this litigation.

54.    This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

55.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of each defined Class are so numerous that individual joinder of all Class Members is impracticable.

While Plaintiff is informed and believes that there are thousands of members of each Class, the precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court- approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

56. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

    a.  Oregon Mutual issued all-risk policies to the members of the Class in exchange for payment of premiums by the Class Members;

    b.  whether the Class suffered a covered loss based on the common policies issued to members of the Class;

    c.  whether Oregon Mutual wrongfully denied all claims based on COVID-19;

    d.  whether Oregon Mutual Business Income coverage applies to a suspension of business caused by COVID-19;

    e.  whether Oregon Mutual Civil Authority coverage applies to a loss of Business Income caused by the orders of state governors requiring the suspension of business as a result of COVID-19;

    f.  whether Oregon Mutual's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

    g.  whether Oregon Mutual's Dependent Property Business Interruption coverage applies to a loss of income caused by loss or damage to dependent properties;

    h.  whether Oregon Mutual has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the related closures; and

    i.  whether Plaintiff and the class are entitled to an award of reasonable attorney fees, interest and costs.

57. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class Members' claims because Plaintiff and the other Class Members are all similarly affected by Defendant's refusal to pay under its Business Income, Civil Authority, and Extra Expense coverages. Plaintiff's claims are based upon the same legal theories as those of the other Class Members. Plaintiff and the other Class Members sustained damages as a direct and

proximate result of the same wrongful practices in which Defendant engaged.

58. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class Members who it seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under its policies, and Plaintiff intends to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiff and its counsel.

59. **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).** Plaintiff seeks class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Business Income, Civil Authority, and Extra Expense coverages. The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant. Moreover, the adjudications sought by Plaintiff could, as a practical matter, substantially impair or impede the ability of other Class Members, who are not parties to this action, to protect their interests.

60. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members.

61.    **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**FIRST CAUSE OF ACTION**

**DECLARATORY JUDGMENT –BUSINESS INCOME COVERAGE**

**(Claim Brought on Behalf of the Business Income Declaratory Judgment Class)**

62.    Plaintiff repeats and realleges Paragraphs 1–61 as if fully set forth herein.

63.    Plaintiff brings this Cause of Action individually and on behalf of the other members of the Business Income Declaratory Judgment Class.

64.    Plaintiff's Oregon Mutual policy, as well as those of the other Business Income Declaratory Judgment Class Members, are contracts under which Oregon Mutual was paid premiums in exchange for its promise to pay Plaintiff and the other Business Income Declaratory Judgment Class Members' losses for claims covered by the policy.

65.    Plaintiff and the other Business Income Declaratory Judgment Class Members have complied with all applicable provisions of the policies and/or those provisions have been waived by Oregon Mutual, or Oregon Mutual is estopped from asserting them, and yet Oregon Mutual has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and the other Business Income Declaratory Judgment Class Members are entitled.

66.    Oregon Mutual has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

*///*

67.   An actual case or controversy exists regarding Plaintiff and the other Business Income Declaratory Judgment Class Members' rights and Oregon Mutual's obligations under the policies to reimburse Plaintiff for the full amount of Business Income losses incurred by Plaintiff and the other Business Income Declaratory Judgment Class Members in connection with suspension of their businesses stemming from the COVID-19 pandemic.

68.   Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Business Income Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

a.   Plaintiff and the other Business Income Declaratory Judgment Class Members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

b.   Oregon Mutual is obligated to pay Plaintiff and the other Business Income Declaratory Judgment Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the relevant time period and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**SECOND CAUSE OF ACTION**

**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**

**(Claim Brought on Behalf of the Civil Authority Declaratory Judgment Class)**

69.   Plaintiff repeats and realleges Paragraphs 1-61 as if fully set forth herein.

70.   Plaintiff brings this Cause of Action individually and on behalf of the other members of the Civil Authority Declaratory Judgment Class.

71.   Plaintiff's Oregon Mutual insurance policy, as well as those of the other Civil Authority Declaratory Judgment Class Members, are contracts under which Oregon Mutual was paid premiums in exchange for its promise to pay Plaintiff and the other Civil Authority Declaratory Judgment Class Members' losses for claims covered by the policy.

**CLASS ACTION COMPLAINT**

72.     Plaintiff and the other Civil Authority Declaratory Judgment Class Members have complied with all applicable provisions of the policies and/or those provisions have been waived by Oregon Mutual, or Oregon Mutual is estopped from asserting them, and yet Oregon Mutual has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and the other Class Members are entitled.

73.     Oregon Mutual denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

74.     An actual case or controversy exists regarding Plaintiff and the other Civil Authority Declaratory Judgment Class Members' rights and Oregon Mutual's obligations under the policies to reimburse Plaintiff and the other Civil Authority Declaratory Judgment Class Members for the full amount of covered Civil Authority losses incurred by Plaintiff and the other Civil Authority Declaratory Judgment Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

75.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Civil Authority Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

  a.   Plaintiff and the other Civil Authority Declaratory Judgment Class Members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

  b.   Oregon Mutual is obligated to pay Plaintiff and the other Civil Authority Declaratory Judgment Class Members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

///

**CLASS ACTION COMPLAINT**

**THIRD CAUSE OF ACTION**

**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**

**(Claim Brought on Behalf of the Extra Expense Declaratory Judgment Class)**

76.    Plaintiff repeats and realleges Paragraphs 1-61 as if fully set forth herein.

77.    Plaintiff brings this Cause of Action individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

78.    Plaintiff's Oregon Mutual insurance policy, as well as those of the other Extra Expense Declaratory Judgment Class Members, are contracts under which Oregon Mutual was paid premiums in exchange for its promise to pay Plaintiff and the other Extra Expense Declaratory Judgment Class Members' losses for claims covered by the policy.

79.    Plaintiff and the other Extra Expense Declaratory Judgment Class Members have complied with all applicable provisions of the policies and/or those provisions have been waived by Oregon Mutual, or Oregon Mutual is estopped from asserting them, and yet Oregon Mutual has abrogated its insurance coverage obligations pursuant to the policies clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and the other Class Members are entitled.

80.    Oregon Mutual  denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

81.    An actual case or controversy exists regarding Plaintiff and the other Extra Expense Declaratory Judgment Class Members' rights and Oregon Mutual's obligations under the policies to reimburse Plaintiff and the other Extra Expense Declaratory Judgment Class Members for the full amount of Extra Expense losses incurred by Plaintiff in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

82.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Extra Expense Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

a.  Plaintiff and the other Extra Expense Declaratory Judgment Class Members'
Extra Expense losses incurred in connection with the Closure Orders and the
necessary interruption of their businesses stemming from the COVID-19
pandemic are insured losses under their policies; and

b.  Oregon Mutual is obligated to pay Plaintiff and the other Extra Expense
Declaratory Judgment Class Members for the full amount of the Extra Expense
losses incurred and to be incurred in connection with the covered losses related
to the Closure Orders during the relevant time period and the necessary
interruption of their businesses stemming from the COVID-19 pandemic.

## FOURTH CAUSE OF ACTION

### DECLARATORY JUDGMENT –
### DEPENDENT PROPERTY BUSINESS INTERRUPTION COVERAGE

#### (Claim Brought on Behalf of the
#### Dependent Property Business Interruption Declaratory Judgment Class)

83.    Plaintiff repeats and realleges Paragraphs 1-61 as if fully set forth herein.

84.    Plaintiff brings this Cause of Action both individually and on behalf of the other
members of the Dependent Property Business Interruption Declaratory Judgment Class.

85.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the
rights and other legal relations of the parties in dispute.

86.    Plaintiff's Policy, as well as the policies of other Dependent Property Business
Interruption Declaratory Judgment Class members, are insurance contracts under which
Defendant was paid premiums in exchange for promises to pay Dependent Property Business
Interruption Declaratory Judgment Class members' losses for claims covered by the Policy.

87.    In the Policy, Defendant promised to pay for losses of business income sustained
as a result of perils not excluded under the Policy. Specifically, Defendant promised to pay for
losses of business income sustained due to direct physical loss or physical damage at the
premises of a dependent property.

///

88.    Plaintiff and Dependent Property Business Interruption Declaratory Judgment Class members suffered losses of business income due to direct physical loss and/or physical damage at the premises of dependent properties.

89.    These losses triggered business income from dependent properties coverage under the Policy and other Dependent Property Business Interruption Declaratory Judgment Class members' policies.

90.    Plaintiff and the other Dependent Property Business Interruption Declaratory Judgment Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

91.    Defendant, without justification, disputes that the Policy and other Dependent Property Business Interruption Declaratory Judgment Class members' policies provide coverage for these losses.

92.    Plaintiff seeks a Declaratory Judgment that its Policy and other Dependent Property Business Interruption Declaratory Judgment Class members' policies provide coverage for the losses of business income attributable to the facts set forth above.

93.    An actual case or controversy exists regarding Plaintiff's and other Dependent Property Business Interruption Declaratory Judgment Class members' rights and Defendant' obligations to reimburse Plaintiff and other Dependent Property Business Interruption Declaratory Judgment Class members for the full amount of these losses. Accordingly, the Declaratory Judgment sought is justiciable.

94.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Extra Expense Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

    a.    The Policy and other Dependent Property Business Interruption Declaratory Judgment Class members' policies provide coverage for Class members' losses of business income from dependent properties.

    b.    Oregon Mutual is obligated to pay Plaintiff and the other Dependent Property Business Interruption Declaratory Judgment Class Members the full amount of the dependent property income losses incurred and to be incurred in connection

with the covered losses related to the Closure Orders and the necessary
interruption of their businesses stemming from the COVID-19 pandemic.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class Members, respectfully
requests that the Court enter judgment in its favor and against Defendant as follows:

    a.   Entering an order certifying the proposed nationwide Classes, as requested herein,
designating Plaintiff as Class representative, and appointing Plaintiff's undersigned
attorneys as Counsel for the Classes;

    b.   Entering declaratory judgments on Counts I–IV in favor of Plaintiff and the
members of the Business Income Declaratory Judgment Class, the Civil Authority
Declaratory Judgment Class, Extra Expense Declaratory Judgment Class, and the
Dependent Property Business Interruption Declaratory Judgment Class, as follows:

        i.   Business Income, Civil Authority, Extra Expense, and Dependent Property
Business Interruption losses incurred in connection with the Closure Orders
and the necessary interruption of their businesses stemming from the
COVID-19 pandemic are insured losses under their policies; and

        ii.   Oregon Mutual is obligated to pay for the full amount of the Business
Income, Civil Authority, Extra Expense, and Dependent Property Business
Interruption losses incurred and to be incurred related to COVID-19, the
Closure Orders and the necessary interruption of their businesses stemming
from the COVID-19 pandemic.

    c.   Ordering Defendant to pay both pre- and post-judgment interest on any amounts
awarded;

    d.   Ordering Defendant to pay attorneys' fees and costs of suit; and

    e.   Ordering such other and further relief as may be just and proper.

**CLASS ACTION COMPLAINT**

1

**JURY DEMAND**

2

Plaintiff hereby demands a trial by jury on all claims so triable.

3

4       Dated: August 6, 2020                    Respectfully submitted,

5

6                                                By: */s/ William F. "Chip" Merlin*

7                                                William F. "Chip" Merlin, Jr.
                                                 CA Bar No. 275936
8                                                cmerlin@MerlinLawGroup.com
                                                 **MERLIN LAW GROUP**
9                                                777 S. Harbour Island Blvd., Suite 950
                                                 Tampa, FL 33602
10                                               Telephone: (813) 229-1000
                                                 Facsimile: (813) 229-3692

11                                               Victor J. Jacobellis
                                                 CA Bar No. 278988
12                                               vjacobellis@merlinlawgroup.com
                                                 Daniel J. Veroff
13                                               CA Bar No. 291492
                                                 dveroff@merlinlawgroup.com
14                                               **MERLIN LAW GROUP**
                                                 1160 Battery St East, Suite 100
15                                               San Francisco, CA 94111
                                                 Telephone: (415) 851-2300
16                                               Facsimile: (415) 960-3882

17                                               Adam M. Moskowitz
                                                 (*Pro Hac Vice* Admission Pending)
18                                               Florida Bar No. 984280
                                                 adam@moskowitz-law.com
19                                               Adam A. Schwartzbaum
                                                 (*Pro Hac Vice* Admission Pending)
20                                               Florida Bar No. 93014
                                                 adams@moskowitz-law.com
21                                               Howard M. Bushman
                                                 (*Pro Hac Vice* Admission Pending)
22                                               Florida Bar No. 0364230
                                                 howard@moskowitz-law.com
23                                               **THE MOSKOWITZ LAW FIRM, PLLC**
                                                 2 Alhambra Plaza, Suite 601
24                                               Coral Gables, FL 33134
                                                 Telephone: (305) 740-1423
25

26

27

28

**CLASS ACTION COMPLAINT**

EXHIBIT A



**OREGON MUTUAL INSURANCE COMPANY**                    M0719AC (1-06)

## NOTICE OF PRIVACY POLICY

Protecting the privacy of our customers is important to us. We want you to understand what data we may collect about you and how we use it.

## OUR POLICY

- We collect and use personal data that is needed to advise customers about our products and to deliver those products.
- We restrict access to your personal data to authorized individuals who need to know this data to provide services and products to you.
- We require every person or organization that assists us in providing products or services to customers to protect the confidentiality of our customer data.
- We provide prospective and former customers the same privacy protection that we do existing customers.
- We disclose personal data only in circumstances where there is no "opt-out."

## SOURCES OF DATA WE MAY COLLECT

We get much of our data from your application for insurance. In the application, we may ask about your age, occupation, physical condition, health history, or prior driving record. We collect only the personal data about our customers that are needed to serve you.

We may obtain data from outside sources such as driving record reports and credit reports. We also obtain data from support organizations that help detect and prevent insurance fraud. We may obtain data from inspection services that view and photograph damaged property. We may request medical reports from a doctor or hospital.

We retain personal data only as long as required by our business practices or by applicable law.

You may request a copy of our records of personal data about you. You may ask us to correct any incorrect data in those records. To submit a request to review your personal data write to us and include your name, policy number and the data you want to review. If you want to request a change to inaccurate data you may call us at 1-800-934-3809. Or you may write to us at Oregon Mutual Group Attention Privacy Manager, P.O. Box 808, McMinnville, OR 97128.

We may not be able to correct inaccuracies in reports provided to us by others. However, if you ask, we will provide the name and address of the agency that prepared the report. You may contact that agency directly and ask them to correct any errors. An organization that provides data to us may provide the same data to others.

## SHARING AND USE OF DATA

We may share data about you with a third party as needed to service your policy or to inform you about our products. The types of persons or organizations with which we may share this data include those that perform business or insurance functions for us, such as independent claim adjusters and businesses that may help us with data processing or marketing. We may share personal data with your insurance agent. We may share personal data to protect against fraud. We may also provide data to a court, government agency or other third parties when subpoenaed or as otherwise required by law. We may share data with our affiliated company for administrative purposes or to provide you with more insurance options.

## PROTECTING DATA

We maintain safeguards to protect your data. Only those members of our staff involved with administering your insurance policy have access to your personal data. We review our privacy practices, monitor our computer networks and test the strength of our security measures. We require companies that provide services to us to agree to safeguard customer data.

This notice is provided under federal and state law. You do not need to contact us to preserve the privacy of your personal data. You may wish to file this notice with your insurance papers. We will be sending you a privacy notice each time that you renew your insurance policy with us.

We value you as a customer. We are working hard to be your company of choice, a company you can continue to trust.



M0719AC (1-06)                    (See reverse side for Consumer Affairs Information)                    T80041.FRM

# CONSUMER AFFAIRS INFORMATION

We will try to resolve any complaint you may have in connection with this insurance.

The California Department of Insurance maintains a Consumer Affairs Division to investigate consumer complaints at:

**California Department of Insurance
Consumer Affairs Division
300 South Spring Street
Los Angeles, California 90013**

**Telephone (Toll Free):  1-800-927-4357**

The Department requests that you should only contact them after we, our agent, or other representative fail to produce a satisfactory solution to your problem.


**Oregon Mutual Insurance Company
1390 Willow Pass Road, Suite 400
Concord, California 94520**

**Telephone (Toll Free):  1-800 444-7012**

M2060B (7-11)

# OREGON MUTUAL INSURANCE COMPANY
P.O. Box 808, •  McMinnville, Oregon  97128

CONTINUATION CERTIFICATE                    INSURED          COPY

## Businessowners Protector Policy

| POLICY NUMBER | POLICY PERIOD | |
|---|---|---|
| BSP720613 | 08/01/2019 TO 08/01/2020 | |
| | 12:01 A.M. Standard Time at Your Mailing Address. | PRESIDENT |

AUTHORIZED REPRESENTATIVE

| NAMED INSURED | CUSTOMER SINCE: | 08/01/2015 | YOUR AGENT |
|---|---|---|---|

CHLOE'S CAFE
STEVEN BAKER & MELANIE KANG
1399 CHURCH ST
SAN FRANCISCO        CA  94114-3924

002773    415-453-0610
GEORGE PETERSEN INSURANCE
PO BOX 3539
SANTA ROSA        CA  95402

THE NAMED INSURED IS: **PARTNERSHIP**                **LOSS HISTORY CREDIT**
BUSINESS DESCRIPTION: RESTAURANTS CASUAL WITH LOUNGE BILLING ACCOUNT: 238892593
PREMISES DESCRIPTION(s)

| PREM. NO.  001     BLDG. NO.  001 | PREM. NO.          BLDG. NO. |
|---|---|
| 1399 CHURCH ST | |
| SAN FRANCISCO    CA  94114-3924 | |
| MORTGAGEE: | MORTGAGEE: |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.
This Declarations Page or Continuation Certificate, when attached, completes the above numbered policy.

---

**BASIC PROPERTY COVERAGE**                                                    **Limits of Insurance**

| Deductible | $ 1,000 | | | | | | |
|---|---|---|---|---|---|---|---|
| Buildings | | PREM. NO. 001 | BLDG. NO. 001 | REPLACEMENT COST | | $ | 141,000 |
| Business Personal Property | | PREM. NO. 001 | BLDG. NO. 001 | REPLACEMENT COST | | $ | 57,000 |

This policy includes Business Income Coverages.  See paragraph A.5.f in Section I - Property of the BUSINESS COVERAGE FORM.

---

**BASIC LIABILITY AND MEDICAL PAYMENTS**

| | |
|---|---|
| General Aggregate Limit  (Other than Products-Completed Operations) | $ 2,000,000 |
| Products Completed Operations Aggregate Limit | $ 2,000,000 |
| Liability and Medical Expenses Limit | $ 1,000,000 |
| Medical Expenses (per Person) | $ 5,000 |
| Damage to Premises Rented to You Limit | $ 300,000 |

Except for Damage to Premises Rented To You, each paid claim for the above coverages reduces the amount of the insurance we
provide during the applicable period.  Please refer to paragraph D.4. in Sect. II - Liability of the BUSINESSOWNERS COVERAGE FORM.

---

**OPTIONAL/MISCELLANEOUS COVERAGES**

| | | | |
|---|---|---|---|
| MONEY/SECURITIES (SPECIAL FORM) | INSIDE | $ | 10,000 |
| | OUTSIDE | | 2,000 |
| EMPLOYEE DISHONESTY | | | 10,000 |
| DEDUCTIBLE LIABILITY | | | *** |
| BLANKET ADDITIONAL INSURED | | | ** |
| CYBERONE COVERAGE | | | *** |
| DATA COMPROMISE COVERAGE | | | *** |

**  INCLUDED IN BASIC LIABILITY

---

| THESE FORMS APPLY:    *** SEE M2071 | PAY PLAN DIRECT BILL | |
|---|---|---|
| | INVOICE TO FOLLOW | TOTAL PREMIUM  $  6,127.00 |
| TERRORISM COVERAGE IS PROVIDED IN THIS POLICY (REFER TO M2071 | | |
| FOR APPLICABLE FORMS) AT A PREMIUM OF      $90.00 | | |
| Renews or Replaces Policy No.:  BSP720613 | M2060B (7-11) | |

T81821 FRM

M2060B (7-11)

# OREGON MUTUAL INSURANCE COMPANY
P.O. Box 808, • McMinnville, Oregon 97128

CONTINUATION CERTIFICATE                    INSURED          COPY

## Businessowners Protector Policy

| POLICY NUMBER | POLICY PERIOD | |
|---|---|---|
| BSP720613 | 08/01/2019 TO 08/01/2020 | |
| | 12:01 A.M. Standard Time at Your Mailing Address. | |

_____ PRESIDENT

| NAMED INSURED | CUSTOMER SINCE: **08/01/2015** | YOUR AGENT | AUTHORIZED REPRESENTATIVE |
|---|---|---|---|

CHLOE'S CAFE
STEVEN BAKER & MELANIE KANG
1399 CHURCH ST
SAN FRANCISCO        CA  94114-3924

002773   415-453-0610
GEORGE PETERSEN INSURANCE
PO BOX 3539
SANTA ROSA          CA  95402

THE NAMED INSURED IS: **PARTNERSHIP**
BUSINESS DESCRIPTION: RESTAURANTS CASUAL WITH LOUNGE
PREMISES DESCRIPTION(s)

**LOSS HISTORY CREDIT**
BILLING ACCOUNT: 238892593

| PREM. NO.  001    BLDG. NO.  001 | PREM. NO.          BLDG. NO. |
|---|---|
| 1399 CHURCH ST | |
| SAN FRANCISCO        CA  94114-3924 | |
| MORTGAGEE: | MORTGAGEE: |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This Declarations Page or Continuation Certificate, when attached, completes the above numbered policy.

| **BASIC PROPERTY COVERAGE** | | | Limits of Insurance |
|---|---|---|---|
| **Deductible** $ | | | |
| **Buildings** | PREM. NO. | BLDG. NO. | $ |
| **Business Personal Property** | PREM. NO. | BLDG. NO. | $ |

This policy includes Business Income Coverages.  See paragraph A.5.f in Section I - Property of the BUSINESS COVERAGE FORM.

| **BASIC LIABILITY AND MEDICAL PAYMENTS** | |
|---|---|
| **General Aggregate Limit  (Other than Products-Completed Operations)** | $ |
| **Products Completed Operations Aggregate Limit** | $ |
| **Liability and Medical Expenses Limit** | $ |
| **Medical Expenses (per Person)** | $ |
| **Damage to Premises Rented to You Limit** | $ |

Except for Damage to Premises Rented To You, each paid claim for the above coverages reduces the amount of the insurance we provide during the applicable period.  Please refer to paragraph D.4. in Sect. II - Liability of the BUSINESSOWNERS COVERAGE FORM.

| **OPTIONAL/MISCELLANEOUS COVERAGES** | |
|---|---|
| HIRED AUTO LIABILITY | $     ** |
| EQUIPMENT BREAKDOWN ENDORSEMENT | *** |
| LIQUOR LIABILITY COVERAGE (EACH COMMON CAUSE) | 1,000,000 |
| NON-OWNED AUTO LIABILITY | ** |
| CLUSTER ENDORSEMENT | *** |
| TERRORISM COVERAGE | *** |

**     INCLUDED IN BASIC LIABILITY

| THESE FORMS APPLY:     *** SEE M2071 | PAY PLAN DIRECT BILL<br>INVOICE TO FOLLOW | TOTAL PREMIUM  $  INCLUDED |
|---|---|---|

| Renews or Replaces Policy No.:  BSP720613 | M2060B (7-11) |
|---|---|

T81821 FRM

**OREGON MUTUAL INSURANCE COMPANY**

### Forms and Endorsements

INSURED Copy

**POLICY NUMBER:** BSP720613                    **EFFECTIVE DATE:** 08/01/2019

**NAMED INSURED:** CHLOE'S CAFE

NOTE:
ALL FORMS ON THIS PAGE APPLY TO ALL STATES UNLESS SUPERSEDED BY A STATE SPECIFIC FORM.

**FORMS**

| NUMBER | REVISION | TITLE |
|---|---|---|
| M2343B | 0106 | LIQUOR LIABILITY COVERAGE |
| BPO417 | 0702 | EMPLOYMENT RELATED PRACTICES EXCLUSION |
| BP1007 | 0702 | YEAR 2000 EXCLUSION - LIABILITY |
| M2428B | 0106 | ADDITIONAL BUILDING PROPERTY |
| M2477B | 0217 | EQUIPMENT BREAKDOWN COV INCL ELECTRONIC CIRCUITRY IMPAIRMENT |
| M2071 | 0298 | OREGON MUTUAL FORMS AND ENDORSEMENTS |
| M2620B | 0816 | LIMITED FUNGI, WET ROT, DRY ROT AND BACTERIA COVERAGE |
| M2630B | 0208 | CLUSTER ENDORSEMENT |
| BPO430 | 0702 | PROTECTIVE SAFEGUARDS |
| BPO441 | 0702 | BUSINESS INCOME CHANGES-INCREASED PERIOD OF RESTORATION |
| BPO493 | 0702 | TOTAL POLLUTION EXCL W/ HEAT EQUIP AND HOSTILE FIRE EXCEPT |
| BPO577 | 1102 | FUNGI OR BACTERIA EXCLUSION (LIABILITY) |
| M2735BC | 0106 | CALIFORNIA - HIRED AUTO AND NON-OWNED AUTO LIABILITY |
| BPO003 | 0702 | BUSINESSOWNERS COVERAGE FORM |
| BPO704 | 0702 | BUSINESS LIABILITY COVERAGE-PROPERTY DAMAGE LIABILITY DEDUCT |
| BPO501 | 0702 | CALCULATION OF PREMIUM |
| M2785BC | 0506 | REMOVAL OF INSURANCE-TO-VALUE PROVISION |
| BPO526 | 0115 | EXCL OF CERT NBCR TERRORISM;CAP ON COVERED CERT ACTS LOSSES |
| M2732B | 0217 | AMENDATORY ENDORSEMENT |
| M2786BC | 0506 | CALIFORNIA CHANGES |
| M2870B | 0114 | ADDITIONAL INSURED-BLANKET ADDITIONAL INSURED |
| M2875 | 0415 | CYBERONE COVERAGE |
| M2872 | 0415 | DATA COMPROMISE COVERAGE |

T6561.FRM

POLICY NUMBER:

**BUSINESSOWNERS
BP 05 26 01 15**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOLOGICAL TERRORISM; CAP ON COVERED CERTIFIED ACTS LOSSES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| The **Exception Covering Certain Fire Losses** (Paragraph **B.2.**) applies to property located in the following state(s): |
|---|
| CALIFORNIA |
| OREGON |
| WASHINGTON |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** **Section I – Property** is amended as follows:

**1.** The following exclusion is added:

**a.** **Limited Exclusion Of Certified Acts Of Terrorism**

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. But this exclusion applies only when one or more of the following are attributed to such act:

**(1)** The terrorism is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

(2) Radioactive material is released, and it appears that one purpose of the terrorism was to release such material; or

(3) The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical material; or

(4) Pathogenic or poisonous biological or chemical material is released, and it appears that one purpose of the terrorism was to release such material.

When this terrorism exclusion applies in accordance with the terms of Paragraph **B.1.a.(1)** or **B.1.a.(2)**, the terrorism exclusion applies without regard to the Nuclear Hazard Exclusion in this Coverage Form.

**2. Exception Covering Certain Fire Losses**

The following exception to the Exclusion in Paragraph **B.1.** applies only if indicated and as indicated in the Schedule of this endorsement.

If a "certified act of terrorism" excluded under Paragraph **B.1.** results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under business income and/or extra expense coverage or endorsements that apply to those coverages.

**C. Section II – Liability** is amended as follows:

**1.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism". However, this exclusion applies only when one or more of the following are attributed to such act:

**a.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**b.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**c.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

**2.** The following definition is added:

**a.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under this coverage form or any applicable endorsement, and includes but is not limited to "bodily injury", "property damage" or "personal and advertising injury" as may be defined in this coverage form or any applicable endorsement.

**D. Section I – Property** and **Section II – Liability** are amended as follows:

**CAP ON CERTIFIED TERRORISM LOSSES**

The following limitation applies to coverage for any one or more "certified acts of terrorism" that are not excluded by the terms of the exclusion in Paragraphs **B.1.** and **C.1.** and to any loss or damage that is covered and to which the exception in Paragraph **B.2.** applies.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**E.** The following provision is added to **Section I – Property** and **Section II – Liability:**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.

© Insurance Services Office, Inc., 2015
**BP 05 26 01 15**
151332.FRM



**OREGON MUTUAL INSURANCE COMPANY**
**BUSINESSOWNERS CLUSTER ENDORSEMENT**

M2630B (2-08)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## LIABILITY COVERAGE SUMMARY

This is a summary of the liability coverages provided by this endorsement. These coverages are subject to the provisions applicable **Section II - Liability** and **Section III - Common Policy Conditions** of the Businessowners policy and the applicable provisions of the **Amendatory Endorsement**. Exclusion - Year 2000 Computer-Related and Other Electronic Problems also applies to these coverages. Refer to the following page for coverage details.

1.    Employment Related Practices Liability Insurance ................................................................................................ 2

## PROPERTY COVERAGE SUMMARY

This is a summary of the coverages provided by this endorsement. These coverages are subject to the provisions applicable **Section I - Property** and **Section III - Common Policy Conditions**, of the Businessowners policy. If there is coverage for the same loss or damage in either the Businessowners Coverage Form or other endorsements attached to the policy the coverage limits provided in this endorsement will be paid in excess of those other limits.

No Business Income and/or Extra Expense coverage is provided by this endorsement except for the coverages provided under Item 4. - Electronic Data Processing Media Extra Expense.

Exclusion of Certain Computer-Related Losses also applies to these coverages.

Refer to the following pages for coverage details.

1.    Accounts Receivable ................................................................................................................................ 2
2.    Arson Reward ........................................................................................................................................... 4
3.    Brands and Labels ................................................................................................................................... 4
4.    Electronic Data Processing Media Extra Expense .................................................................................. 4
5.    ERISA Extension ...................................................................................................................................... 4
6.    Errors and Omissions in Describing a Premises or Location ................................................................... 5
7.    Fine Arts ................................................................................................................................................... 5
8.    Fire Department Service Charges and Replacement of Fire Extinguishing Materials ............................ 5
9.    Inventory and Appraisal Cost .................................................................................................................. 5
10.   Mechanical Breakdown of Computer Equipment .................................................................................... 5
11.   Money Orders and Counterfeit Paper Currency ...................................................................................... 5
12.   Newly Acquired or Constructed Property ................................................................................................ 6
13.   Outdoor Property ..................................................................................................................................... 6
14.   Outdoor Unattached Signs ...................................................................................................................... 6
15.   Permanent Outdoor Structures for Trash Bins ....................................................................................... 6
16.   Personal Property Off Premises .............................................................................................................. 7
17.   Spoilage of Perishable Stock ................................................................................................................... 7
18.   Valuable Papers and Records and Electronic Media and Records ......................................................... 8
19.   Vehicle Damage to Leased Property ....................................................................................................... 10
20.   Water Backup ........................................................................................................................................... 10

## LIABILITY COVERAGE

1. **Employment Related Practices Exclusion**

   A. The Employment Related Practices Exclusion (BP 0417) attached to this policy, applies to this policy with respect to:
      1. losses that are below the $250 deductible stated in paragraph E, and
      2. losses that exceed the $5,000 limit shown in paragraph D.

   B. If endorsement M2375B, Businessowners Liability (Section II) Exclusion applies to this policy, this coverage, Employment Related Practices Liability Insurance, is not applicable.

   C. The Businessowners Liability coverage provided by this policy includes **Bodily Injury** or **Personal Injury** to:
      1. A person arising out of any:
         a. Refusal to employ that person;
         b. Termination of that person's employment; or
         c. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or
      2. The spouse, child, parent, brother or sister of that person as a consequence of **bodily injury** or **personal injury** to that person at whom any of the employment-related practices described in paragraphs a., b. or c. above is directed.

   D. The most we will pay for losses, including defense costs, occurring in any annual policy period under this coverage is $5,000 regardless of the number of:
      1. Insureds;
      2. Claims made or **suits** brought; or
      3. Persons or organizations making claims or bringing **suits**.

   E. Our obligation under this coverage to pay damages or defense costs on your behalf applies only to amounts in excess of $250.

## PROPERTY COVERAGES

1. **Accounts Receivable**

   A. **COVERAGE**
      1. We will pay:
         a. All amounts due from your customers that you are unable to collect;
         b. Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;
         c. Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and
         d. Other reasonable expenses that you incur to re-establish your records of accounts receivable;

         that result from direct physical loss or damage by any Covered Causes of Loss to your records of accounts receivable.

   2. **Property Not Covered**

      Covered property does not include contraband, or property in the course of illegal transportation or trade.

   3. **Covered Causes of Loss**

      Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS to your records of accounts receivable except those causes of loss listed in the Exclusions.

   4. **Additional Coverage - Collapse**

      We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

      a. Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage; breakage of building glass.
         (1) Falling objects does not include loss or damage to:
            (a) Property in the open; or
            (b) Property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.
         (2) Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

      b. Hidden decay;
      c. Hidden insect or vermin damage;
      d. Weight of people or personal property;
      e. Weight of rain that collects on a roof;
      f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

5. **COVERAGE EXTENSION**

Removal

If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of loss or damage, we will pay for loss or damage while they are:

a. At a safe place away from the described premises;

b. Being taken to and returned from that place.

This Coverage Extension is included within the Limit of Insurance applicable to the premises from which the Covered Property is removed.

B. **EXCLUSIONS**

1. Paragraph **B. - Exclusions** of **Section I-Property** does not apply to this coverage, except for:

a. Paragraph **B.1.c., Governmental Action**;

b. Paragraph **B.1.d., Nuclear Hazard**;

c. Paragraph **B.1.f., War and Military Action**;

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Dishonest acts by you, anyone else with an interest in the property, or your or their employees or authorized representatives, or anyone entrusted with the property, whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

But this exclusion does not apply to a carrier for hire.

b. Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

c. Bookkeeping, accounting or billing errors or omissions.

d. Electrical or magnetic injury, disturbance or erasure of electronic recordings.

But we will pay for direct loss or damage caused by lightning.

e. Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

f. Unauthorized instructions to transfer property to any person or to any place.

3. We will not pay for loss or damage that required any audit of records or any inventory computation to prove its factual existence.

4. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

a. Weather conditions. But this exclusion only applies if weather conditions initiate or set in motion a cause or event excluded in paragraph 1.a., 1.b. or 1.c. above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance of part or all of any property on or off the described premises.

C. **LIMIT OF INSURANCE**

The most we will pay for loss or damage for accounts receivable at the described premises in any one occurrence is $25,000.

For accounts receivable not at the described premises, the most we will pay is $7,500.

D. **ADDITIONAL CONDITIONS**

The following is added to paragraph **E.6.d. - Loss Payment Condition**:

1. If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage, the following method will be used:

(a) Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

(b) Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

2. The following will be deducted from the total amount of accounts receivable, however that amount is established:

   (a) The amount of the accounts for which there is no loss or damage;

   (b) The amount of the accounts that you are able to re-establish or collect;

   (c) An amount to allow for probable bad debts that you are normally unable to collect; and

   (d) All unearned interest and service charges.

E. Deductible

No deductible applies to this coverage.

2. **Arson Reward**

The Company will pay an additional amount of $2,500 as a reward for information leading to an arson conviction for damage to covered property. No deductible applies to this additional coverage.

3. **Brands and Labels**

The following is added to paragraph **E.6. - Loss Payment Conditions** of the policy:

If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of loss, we may take all or any part of the property at an agreed or appraised value. If so, you may, at your own expense:

A. Stamp "salvage" on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

B. Remove the brands or labels, if doing so will not physically damage the merchandise. You must relabel the merchandise or its containers to comply with the law.

No deductible applies to this coverage.

4. **Electronic Data Processing Media Extra Expense**

We will pay your necessary extra expense to continue normal operations following loss or damage to your electronic data processing media from a Covered Cause of Loss. The most we will pay under this Extension is $10,000 in any one occurrence.

The deductible applicable to the Businessowners Property Section of the policy applies to this coverage.

5. **ERISA Extension**

The following is added under **Section 1-Property, G. 3. Optional Coverages:**

j. In compliance with certain provisions of the Employee Retirement Income Security Act (ERISA)

   1. Employee also includes any natural person who is:

      (a) A trustee, an officer, employee, administrator or a manager, except an administrator or a manager who is an independent contractor, of any "employee benefit plan(s)" (herein after called Plan) insured under this insurance.

      (b) Your director or trustee while that person is handling funds or other property of any Plan insured under this insurance.

   2. If any Plan is insured jointly with any other entity under this policy, you or the plan Administrator must select a Limit of Insurance for this Optional Coverage that is sufficient to provide an amount of insurance for each Plan that is at least equal to that required if each Plan were separately insured.

   3. If the Insured first named in the Declarations that apply to this policy is an entity other than a Plan, any payment we make to the Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.

   4. If two or more Plans are insured under this insurance, any payment we make for loss:

      (a) Sustained by two or more plans, or

      (b) Of commingled funds or other property of two or more Plans;

      that arises out of one occurrence, is to be shared by each Plan sustaining loss in the proportion that the amount of insurance required for each such Plan under ERISA provisions bears to the total of those amounts.

   5. The Deductible provision contained in this policy does not apply to loss sustained by any Plan subject to ERISA which is insured under this Optional Coverage.

   6. "Employee benefit plan(s)" means any welfare or pension benefit plan that is subject to the Employee Retirement Income Security Act of 1974 (ERISA).

6. **Errors and Omissions in Describing a Premises or Location**

   The following is added to the Loss Payment Conditions of the policy:

   h.  The Insured will not be penalized because of any unintentional error or omission the Insured may make in listing or describing a premises or location to be covered under this policy.

   No deductible applies to this coverage.

7. **Fine Arts**

   A.  We will pay for loss or damage to your "fine arts" at the described premises if loss or damage is caused by or results from Covered Cause of Loss. Your "fine arts" under this additional coverage will be valued at their market value at the time of loss.

   B.  The most we will pay for "fine arts" at any premises described in the Declarations is $10,000.

   C.  The occurrence deductible applicable to personal property applies to this additional coverage. If the policy does not provide personal property coverage at the location involved in a loss, the deductible applicable to the building will apply. If the occurrence deductible varies by location, the highest occurrence deductible applicable to any location shall apply.

   D.  "Fine arts" means paintings, etchings, pictures, tapestries, art glass windows, valuable rugs, statuary, marbles, bronzes, antique furniture, rare books, antique silver, manuscripts, porcelains, rare glass, bric-a-brac, and similar property of rarity, historical value or artistic merit.

8. **Fire Department Service Charges and Replacement of Fire Extinguishing Materials**

   Paragraph **A.5.c - Fire Department Service Charge** is replaced by the following:

   A.  When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $10,000 for your liability for fire department service charges:

   1.  Assumed by contract or agreement prior to loss; or

   2.  Required by local ordinance.

   B.  The Company will pay the cost of foam solutions, dry chemicals, halon or other fire extinguishing materials to recharge Fire Extinguishers which have been lost, expended, damaged, or destroyed when caused by or resulting from a Covered Cause of Loss at the premises described in the Declarations or adjacent to such property.

   C.  No deductible applies to this coverage.

9. **Inventory and Appraisal Cost**

   A.  We will pay for the cost of any inventory or appraisal required by paragraph **E.2 - Property Loss Conditions** of **Section I - Property** that is a result of direct physical loss or damage to covered property caused by or resulting from a Covered Cause of Loss.

   B.  The most the Company will pay for this additional coverage is $2,500.

   C.  No deductible applies to this additional coverage.

10. **Mechanical Breakdown of Computer Equipment**

   A.  Computer Equipment

   The Company will pay for direct physical loss of or damage to covered computer equipment inside the Insured's building for:

   1.  Mechanical breakdown or machinery breakdown;

   2.  Short circuit, blowout, or other electrical damage to electrical equipment, apparatus, or devices, including wiring.

   B.  Data Or Media

   The Company will pay for direct physical loss or damage to the Insured's data or media caused when the Insured's computer equipment mechanically breaks down or malfunctions while data is being run through the system. The Company will pay for direct physical loss or damage to the Insured's data or media caused by electrical or magnetic injury, disturbance, or erasure of electronic recordings provided that the damage occurs inside the Insured's building.

   C.  Coverage Restriction

   The Company will not pay for loss or damage caused by any change in the Insured's electric power supply, such as interruption, power surge, or brown out, if the change originates more than 100 feet from the building containing the Insured's computer equipment.

   D.  Limit Of Insurance

   The most the Company will pay for loss or damage in any one occurrence is $10,000.

   E.  The deductible applicable to **Section I - Property** of the policy applies to this coverage.

11. **Money Orders and Counterfeit Paper Currency**

   Under **Section I - Property, 5. - Additional Coverages, j. - Money Orders And Counterfeit Paper Currency.**

   The most we will pay for any loss under this **Additional Coverage** is $25,000.

12. **Newly Acquired or Constructed Property**

The following replaces paragraph **A.6.a. - Coverage Extension** of **Section I - Property** of the policy:

A.  You may extend the insurance that applies to Building to apply to:

1.  Your new buildings while being built on the described premises; and

2.  Buildings you acquire at locations other than the described premises intended for:

    a.  Similar use as the building described in the Declarations; or

    b.  Use as a warehouse.

The most we will pay for loss or damage under this Extension is $1,000,000.

B.  You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is $500,000 at each building.

C.  Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

1.  This policy expires.

2.  90 days expire after you acquire or begin to construct the property; or

3.  You report values to us.

We will charge you additional premium for values reported from the date construction begins, or the date you acquire the property.

D.  If you have two or more policies in force with us which provide this same coverage extension, the limit of insurance will be the limit which provides the highest amount of coverage to you, but in no case shall the coverage extension from more than one policy apply.

E.  The deductible applicable to **Section I - Property** of the policy applies to this coverage.

13. **Outdoor Property**

The following replaces paragraph **A.6.c. - Coverage Extension Section I - Property** of the policy.

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas, signs (other than signs attached to buildings), trees, shrubs and plants (other than stock of trees, shrubs, or plants), including debris removal expense, caused by or resulting from any of the following Causes of Loss:

A.  Fire;

B.  Lightning;

C.  Explosion;

D.  Riot or Civil Commotion; or

E.  Aircraft.

The most we will pay for loss or damage under this Extension is $10,000 but not more than $500 for any one tree, shrub or plant.

The deductible applicable to **Section I - Property** of the policy applies to this coverage.

14. **Outdoor Unattached Signs**

(This coverage does not apply if claim is made under the Outdoor Property coverage.)

A.  We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

1.  Owned by you; or

2.  Owned by others but in your care, custody or control.

B.  Paragraph A.3., Covered Causes of Loss, and Paragraph B., Exclusions, do not apply to this Coverage, except for:

1.  Paragraph **B.1.c., Governmental Action**;

2.  Paragraph **B.1.d., Nuclear Hazard;** and

3.  Paragraph **B.1.f., War and Military Action**.

C.  We will not pay for loss or damage caused by or resulting from:

1.  Wear and tear,

2.  Hidden or latent defect;

3.  Rust;

4.  Corrosion; or

5.  Mechanical breakdown.

D.  The most we will pay for loss or damage in any one occurrence is $10,000.

E.  The provisions of this Coverage except for the Outdoor Sign Coverage provided in Paragraph **G.1** of the Optional Coverages, and the deductible provisions, supersede all other references to outdoor signs in this policy.

The deductible applicable to **Section I - Property** of the policy applies to this coverage.

15. **Permanent Outdoor Structures for Trash Bins**

A.  We will pay for direct physical loss or damage to permanent outdoor structures designed to contain trash or recycling bins at the described premises:

1.  Owned by you; or

2.  Owned by others but in your care, custody or control.

B.  Paragraph A.3. - **Covered Causes of Loss**, and Paragraph **B. - Exclusions in Section I - Property,** does not apply to this Coverage, except for:

1.  Paragraph **B.1.c., Government Action**;

2.  Paragraph **B.1.d., Nuclear Hazard**; and

3.  Paragraph **B.1.f., War and Military Action.**

C. We will not pay for loss or damage caused by or resulting from:
  1. Wear and tear,
  2. Hidden or latent defect;
  3. Rust;
  4. Corrosion; or
  5. Mechanical breakdown.
D. The most we will pay for loss or damage in any one occurrence is $5,000.
E. the deductible applicable to **Section I - Property** of the policy applies to the coverage.

16. **Personal Property Off Premises**
You may extend the insurance that applies to Business Personal Property to apply to covered Business Personal Property, other than "money" and "securities", while the property is in the course of transit; temporarily at a premises you do not own, lease or operate; or, if the Named Insured is a sole proprietor, at the Named Insured's place of residence.

We will also pay for direct physical loss of or damage to display booths and related equipment and Business Personal Property owned by the Insured, or owned by others but in the Insured's care, custody or control, while being used at or transported to or from events away from the insured premises.

The most we will pay for loss or damage under this Extension is $10,000.

The deductible applicable to **Section I - Property** of the policy applies to this coverage.

17. **Spoilage of Perishable Stock**
**Section I - Property** of the Policy is extended to insure against direct physical loss of or damage to perishable stock.

The following provisions (A. through I. inclusive) apply to the coverage provided herein:
A. Paragraph **A.1. - Covered Property** is replaced by the following:
  1. **Covered Property**
  Covered Property means "perishable stock" at the described premises, if the "perishable stock" is:
    (a) Owned by you and used in your business; or
    (b) Owned by others and in your care, custody or control.
  Property described by (b) above is not covered for more than the amount for which you are legally liable, plus the cost of labor, materials, or services furnished or arranged by you on that property.

B. The following is added to Paragraph **A.2. - Property Not Covered;**
  g. Property located:
    (1) On buildings;
    (2) In the open; or
    (3) In vehicles.
C. Paragraph **A.3. - Covered Causes of Loss** is replaced by the following:

3. **Covered Causes of Loss**
Subject to the exclusions described in item D herein, Covered Causes of Loss means the following:
  a. Breakdown or Contamination, meaning:
    (1) Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such apparatus or equipment is at the described premises; or
    (2) Contamination by a refrigerant, only while the refrigerating apparatus or equipment is at the described premises.
    Mechanical breakdown and mechanical failure do not mean power interruption, regardless of how or where the interruption is caused and whether or not the interruption is complete or partial.
  b. Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.
D. Paragraph **B. Exclusions** is replaced by the following:
  B. **Exclusions**
    1. Of the Exclusions contained in paragraph B.1. only the following apply to Spoilage Coverage:
      b. **Earth Movement**;
      c. **Governmental Action**;
      d. **Nuclear Hazard**;
      f. **War and Military Action**; and
      g. **Water**.
    2. The following Exclusions are added:
    We will not pay for loss or damage caused by or resulting from:
      a. The disconnection of any refrigerating, cooling or humidity control system from the source of power.
      b. The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

c. The inability of an electrical utility company or other power source to provide sufficient power due to:

   (1) Lack of fuel; or

   (2) Governmental order.

d. The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

e. Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

E. **LIMIT OF INSURANCE**

The most we will pay for loss or damage to "Perishable Stock" in any one "occurrence" is $15,000.

F. **CONDITIONS**

1. Paragraph **E.6.d. - Property Loss Conditions** is replaced by the following:

  d. We will determine the value of Covered Property as follows:

    (1) For "perishable stock" you have sold but not delivered, at the selling price less discounts and expenses otherwise would have had;

    (2) For other "perishable stock", at actual cash value.

G. Paragraph **G. Optional Coverages** does not apply.

H. The following is added to the DEFINITIONS:

"Perishable Stock" means property:

1. Maintained under controlled temperature or humidity conditions for preservation; and

2. Susceptible to loss or damage if the controlled temperature or humidity conditions change.

I. The deductible applicable to **Section I - Property** of the policy applies to this coverage.

18. **Valuable Papers and Records and Electronic Media and Records**

A. Coverage

The Company will pay for direct physical loss or damage to Covered Property from any of the Covered Causes of Loss.

1. Covered Property

  a. Valuable Papers and Records

   Covered Property means the following type of property that is the Insured's property or property of others in the Insured's care, custody or control;

   Valuable papers and records, meaning inscribed, printed or written:

    (1) Documents;

    (2) Manuscripts; and

    (3) Records;

   including abstracts, books, deeds, drawings, films, maps, or mortgages.

But valuable papers and records does not mean:

    (4) "Money" or "Securities";

    (5) Converted Data;

    (6) Programs or instructions used in the Insured's data processing operations, including the materials on which the data is recorded.

  b. Electronic Media and Records

   Covered Property means the following type of property that is the Insured's property or property of others in the Insured's care, custody or control;

    (1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

    (2) Data stored on such media; and

    (3) Programming records used for electronic data processing or electronically controlled equipment.

2. Property Not Covered

Covered Property does not include:

  a. Property held as samples or for delivery after sale;

  b. Property in storage away from the described premises; or

  c. Contraband, or property in the course of illegal transportation or trade.

3. Covered Causes of Loss

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS to Covered Property except those causes of loss listed in the Exclusions.

4. Additional Coverage - Collapse:

The Company will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused by one or more of the following:

  a. Fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, riot or civil commotion, vandalism, leakage from fire extinguishing equipment, sinkhole collapse, volcanic action, falling objects, weight of snow, ice or sleet, water damage, breakage of building glass, all only as insured against in this policy.

(1) Falling objects does not include loss or damage to:

    (a) Property in the open; or

    (b) Property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

(2) Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

b. Hidden decay;

c. Hidden insect or vermin damage;

d. Weight of people or personal property;

e. Weight of rain that collects on a roof;

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

5. Coverage Extension

Removal

If the Insured gives the Company written notice within 10 days of removal of Covered Property because of imminent danger of loss or damage, the Company will pay for loss or damage while it is:

a. At a safe place away from the described premises; or

b. Being taken to and returned from that place.

This Coverage Extension is included within the Limits of Insurance applicable to the premises from which the Covered Property is removed.

B. Exclusions

The Company will not pay for loss or damage caused by or resulting from any of the following:

1. Seizure or destruction of property by order of governmental authority.

But the Company will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

2. Nuclear reaction or radiation, or radioactive contamination, however caused.

But if loss or damage by fire results, the Company will pay for that resulting loss or damage.

3. War, including undeclared or civil war, warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents, or insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

4. Dishonest acts by:

a. the Insured or the Insured's employees or authorized representatives;

b. anyone else with an interest in the property, or their employees or authorized representatives; or

c. anyone entrusted with the property, whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

But this exclusion does not apply to a carrier for hire.

5. Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

6. Bookkeeping, accounting or billing errors or omissions.

7. Electrical or magnetic injury, disturbance or erasure of electronic recordings. But the Company will pay for direct loss or damage caused by lightning.

8. Voluntary parting with any property by the Insured or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

9. Unauthorized instructions to transfer property to any person or to any place.

10. The Company will not pay for loss or damage that required any audit of records or any inventory computation to prove its factual existence.

11. The Company will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, the Company will pay for that resulting loss or damage.

a. Weather conditions. But this exclusion only applies if weather conditions initiate or set in motion a cause or event excluded in paragraph 1., 2., or 3., above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:
   (1) Planning, zoning, development, surveying, siting;
   (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
   (3) Materials used in repair, construction, renovation or remodeling; or
   (4) Maintenance;
   of part or all of any property on or off the described premises.

## C. LIMIT OF INSURANCE

1. The most the Company will pay for loss or damage to Valuable Papers and Records (other than electronic media and records) at the described premises in any one occurrence is $25,000.
   For Valuable Papers and Records (other than electronic media and records) not at the described premises, the most the Company will pay is $7,500.

2. The most the Company will pay for loss or damage to Electronic Media and Records at the described premises in any one occurrence is $10,000.
   For Electronic Media and Records not at the described premises, the most the Company will pay is $1,000.
   If the Named Insured is a sole proprietor, the most the Company will pay for Electronic Media and Records at the Named Insured's place of residence is $1,000.

## D. Property Loss Conditions

The following is added to paragraph **E.6. - Loss Payment Conditions** of the policy:

1. The Company will determine the value of Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:
   a. Blank materials for reproducing the records; and
   b. Labor to transcribe or copy the records.
   This Loss Condition does not apply to Valuable Papers and Records, or data or programming records that are actually replaced or restored.

## E. Definitions Applicable To This Coverage

1. "Money" means:
   a. Currency, coins and bank notes whether or not in current use; and
   b. Travelers checks, register checks and money orders held for sale to the public.

2. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:
   a. Tokens, tickets, revenue and other stamps whether or not in current use; and
   b. Evidences of debt issued in connection with credit or charge cards, which are not of the Insured's own issue;
   but does not include "money".

## F. Deductible

No deductible applies to this coverage.

## 19. **Vehicle Damage to Leased Property**

The following is included under Paragraph.**A.1. - Covered Property** of **Section I - Property**: We cover against risks of direct physical loss caused by "vehicle damage" to leased property consisting of buildings, machinery and equipment, fixtures, pumps and tanks, and outdoor equipment. This leased property must pertain to the maintenance, service or occupancy of the insured premises and is covered only while on the insured premises.

The most the company will pay for loss or damage from Vehicle Damage to leased Property is $100,000 per occurrence.

"Vehicle damage" means direct physical loss resulting from actual physical contact of a land motor vehicle with the leased property described in this section.

The deductible applicable to **Section I - Property** of the policy applies to this coverage.

## 20. **Water Back Up**

The Company will pay for loss to covered property caused by or resulting from water that backs up into a described location from a sewer or drain. This does not include water that backs up as a result of flooding of an ocean, river, lake, creek or similar body of water.

The most the Company will pay for loss or damage from water back up is $5,000 per occurrence.

Exclusion B.1.g. of the Property section of the policy does not apply to this Extension.

The deductible applicable to **Section I - Property** of the policy applies to this coverage.

POLICY NUMBER:                                                          **BUSINESSOWNERS**
                                                                       **BP 04 30 07 02**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**SCHEDULE\***

| Premises No. | Building No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 001 | 001 | P9 |

**Describe Any "P-9":**   ALL COOKING SURFACES AND APPLIANCES MUST BE COVERED BY AN UL LISTED AUTOMATIC SUPPRESSION SYSTEM, TO BE MAINTAINED BY AN INDEPENDENT CONTRACTOR ON A SEMI-ANNUAL BASIS

HOODS AND DUCT WORK OVER THE COOKING SURFACES AND APPLIANCES MUST BE CLEANED BY AN INDEPENDENT CONTRACTOR ON A SEMI-ANNUAL BASIS

\*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declaration.

**A.** The following is added to the **Property General Conditions** in **Section I – Property:**

**PROTECTIVE SAFEGUARDS**

**1.** As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

**2.** The protective safeguards to which this endorsement applies are identified by the following symbols:

**a.** **"P-1" Automatic Sprinkler System,** including related supervisory services.

Automatic Sprinkler System means:

**(1)** Any automatic fire protective or extinguishing system, including connected:

**(a)** Sprinklers and discharge nozzles;

**(b)** Ducts, pipes, valves and fittings;

**(c)** Tanks, their component parts and supports; and

**(d)** Pumps and private fire protection mains.

**(2)** When supplied from an automatic fire protective system:

**(a)** Non-automatic fire protective systems; and

**(b)** Hydrants, standpipes and outlets.

**b.** **"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

**(1)** Connected to a central station; or

**(2)** Reporting to a public or private fire alarm station.

**c.** **"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**d.** **"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**e.** **"P-9"** The protective system described in the Schedule.

**B.** The following is added to Paragraph **B. Exclusions** in **Section I – Property:**

We will not pay for loss or damages caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.



**OREGON MUTUAL INSURANCE COMPANY**                         M3125 (9-15)

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE

Coverage for acts of terrorism may be included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under your coverage, if coverage is provided, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as exclusion for nuclear events. Under the formula, the United States Government generally reimburses (85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020) of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

<u>Information required to complete this schedule, if not shown below, will be shown in the Declarations.</u>

**Coverage**                                                    **Terrorism Premium**



**OREGON MUTUAL INSURANCE COMPANY**
**BUSINESSOWNERS**
**LIQUOR LIABILITY COVERAGE**

M2343B (1-06)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM
BUSINESSOWNERS AMENDATORY ENDORSEMENT

**SCHEDULE\***

| Each Common Cause Limit |
|---|
| |

\*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**Section II – Liability** of the BUSINESSOWNERS COVERAGE FORM is amended as follows:

**A.** The insurance provided under Paragraph **A.1. Business Liability,** also applies to all "bodily injury" or "property damage" arising out of the selling, serving or furnishing of alcoholic beverages.

**B.** For the insurance provided by this endorsement only, Paragraph **B. Exclusions** is amended as follows:

**1.** Paragraph **1. Applicable To Business Liability Coverages,** other than Exclusions **a. Expected Or Intended Injury, d. Workers' Compensation And Similar Laws** and **e. Employer's Liability,** does not apply.

**2.** The following exclusions are added:

This insurance does not apply to:

**a.** "Bodily injury" or "property damage" arising out of any alcoholic beverage sold, served or furnished while any required license is suspended or after such license expires, is cancelled or revoked.

**b.** "Bodily injury" or "property damage" arising out of "your product". This exclusion does not apply to "bodily injury" or "property damage" for which the insured or the insured's indemnitees may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

**c.** Any "bodily injury" or "property damage" with respect to which other insurance is afforded, or would be afforded but for the exhaustion of the limits of insurance.

This exclusion does not apply if the other insurance responds to liability for "bodily injury" or "property damage" imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage.

**C.** The following is added to Paragraph **D. Liability And Medical Expenses Limits Of Insurance:**

**D.** **Liability And Medical Expenses Limits Of Insurance**

**5.** Subject to the General Aggregate Limit shown on the Declarations, the Each Common Cause Limit shown in the Schedule of this endorsement is the most we will pay for all "bodily injury" or "property damage" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of alcoholic beverages to any one person.

Liability And Medical Expenses Limit Of Insurance shown in the Declarations does not apply to damages arising out of the selling, serving or furnishing of alcoholic beverages.

**Paragraph B.4** of the BUSINESSOWNERS AMENDATORY ENDORSEMENT is replaced by the following:

**4.** Paragraph **D.4 Aggregate Limits** is replaced by the following:

    **4. Aggregate Limits**

      The most we will pay for:

      **a.** All "bodily injury" or "property damage" that is included in the "products-completed operations hazard" is the amount shown in the Declarations as the Products–Completed Operations Aggregate Limit; and

      **b.** All:

        **(1)** "Bodily injury" or "property damage" except damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard";

        **(2)** Plus "bodily injury" or "property damage" covered under the Liquor Liability Coverage;

        **(3)** Plus medical expenses;

        **(4)** Plus all "personal and advertising injury" caused by offenses committed;

      is the amount shown in the Declarations as the General Aggregate Limit.

      These Aggregate Limits do not apply to "property damage" to premises while rented to you or temporarily occupied by you with the permission of the owner, arising out of fire or explosion.

The Limits of Insurance of **Section II – Liability** apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

      Includes Copyrighted material of Insurance Services Office, Inc., with its permission      M2343B (1-06)
T80162.FRM

**OREGON MUTUAL INSURANCE COMPANY**
**BUSINESSOWNERS**
**CALIFORNIA - HIRED AUTO AND NON-OWNED**
**AUTO LIABILITY**

M2735BC (1-06)

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| Coverage | Additional Premium |
|---|---|
| **A.  Hired Auto Liability:** | INCL |
| **B.  Non-Owned Auto Liability:** | INCL |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** Throughout this endorsement the term spouse means:

Spouse or a registered domestic partner under California law.

**B.** Insurance is provided only for those coverages for which a specific premium charge is shown in the Declarations or in the Schedule.

**1. Hired Auto Liability**

The insurance provided under Paragraph **A.1. Business Liability in Section II – Liability,** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**2. Non-Owned Auto Liability**

The insurance provided under Paragraph **A.1. Business Liability in Section II – Liability,** applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person.

**C.** For insurance provided by this endorsement only:

**1.** The exclusions, under the Paragraph **B.1. Applicable To Business Liability Coverages** in **Section II – Liability,** other than Exclusions **a., b., d., f.** and **i.** and the Nuclear Energy Liability Exclusion, are deleted and replaced by the following:

**a.** "Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(a)** Whether the insured may be liable as an employer or in any other capacity; and

**(b)** To any obligation to share damages with or repay someone else who must pay damages because of injury.

This exclusion does not apply to:

**(i)** Liability assumed by the insured under an "insured contract"; or

**(ii)** "Bodily injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers compensation law.

**b.** "Property damage" to:

**(1)** Property owned or being transported by, or rented or loaned to the insured; or

**(2)** Property in the care, custody or control of the insured.

2. Paragraph **C. Who Is An Insured** in **Section II – Liability,** is replaced by the following:

Each of the following is an insured under this endorsement to the extent set forth below:

a. You;

b. Any other person using a "hired auto" with your permission;

c. For a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business; and

d. Any other person or organization, but only for their liability because of acts or omissions of an insured under **a., b.** or **c.** above.

None of the following is an insured:

(1) Any person engaged in the business of his or her employer for "bodily injury" to any co-"employee" of such person injured in the course of employment, or to the spouse, child, parent, brother or sister of that co-"employee" as a consequence of such "bodily injury", or for any obligation to share damages with or repay someone else who must pay damages because of the injury;

(2) Any partner or "executive officer" for any "auto" owned by such partner or officer or a member of his or her household;

(3) Any person while employed in or otherwise engaged in duties in connection with an "auto business", other than an "auto business" you operate;

(4) The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee; or

(5) Any person or organization for the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

D. The following additional definitions apply:

1. "Auto Business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

2. "Hired Auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees" or members of their households, or from any partner or "executive officer" of yours.

3. "Non-Owned Auto" means only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs.

POLICY NUMBER:                                                    **BUSINESSOWNERS**
                                                                 **BP 07 04 07 02**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BUSINESS LIABILITY COVERAGE – PROPERTY DAMAGE LIABILITY DEDUCTIBLE (PER OCCURRENCE BASIS)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE*

| Amount Of Deductible |
| --- |
| **Per Occurrence** |
| **$** 1000 |

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** Our obligation under Paragraph **A. Coverages** in **Section II – Liability** to pay damages on your behalf because of "property damage" applies only to the amount of damages in excess of the deductible amount shown in the Schedule.

**B.** The deductible amount shown in the Schedule applies to the total of all damages because of "property damage" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain "property damage" because of that "occurrence".

**C.** The terms of this insurance, including those with respect to:

**1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

**2.** Your duties in the event of an "occurrence", claim, or "suit"

apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.



**OREGON MUTUAL INSURANCE COMPANY**
**CYBERONE COVERAGE**
**COMPUTER ATTACK AND NETWORK SECURITY LIABILITY**

M2875 (4-15)

---

**THIS CYBERONE™ COVERAGE IS WRITTEN ON A CLAIMS-MADE BASIS AND PROVIDES NO COVERAGE FOR CLAIMS ARISING OUT OF INCIDENTS, OCCURRENCES OR ALLEGED WRONGFUL ACTS WHICH TOOK PLACE PRIOR TO THE FIRST INCEPTION OF THIS COVERAGE. THIS COVERAGE COVERS ONLY CLAIMS ACTUALLY MADE AGAINST THE INSURED WHILE THE COVERAGE REMAINS IN EFFECT, AND ALL COVERAGE UNDER THIS ENDORSEMENT CEASES UPON THE TERMINATION OF THE COVERAGE, EXCEPT FOR THE AUTOMATIC EXTENDED REPORTING PERIOD COVERAGE AND ANY ADDITIONAL EXTENDED REPORTING PERIOD COVERAGE PURCHASED BY THE INSURED. PLEASE NOTE THAT DEFENSE COSTS ARE SUBJECT TO THE APPLICABLE LIMIT AND DEDUCTIBLE. SPECIFICALLY, DEFENSE COSTS ARE SUBJECT TO THE NETWORK SECURITY DEFENSE LIMIT SET FORTH IN THE SCHEDULE BELOW. THIS MEANS THAT THE NETWORK SECURITY DEFENSE LIMIT SPECIFIED IN THIS CYBERONE™ COVERAGE FORM MAY BE COMPLETELY EXHAUSTED BY DEFENSE COSTS. IN THE EVENT THAT THE NETWORK SECURITY DEFENSE LIMIT IS EXHAUSTED, THE INSURED SHALL NOT BE LIABLE FOR ADDITIONAL DEFENSE COSTS. THE NETWORK SECURITY DEFENSE LIMIT APPLIES ON AN ANNUAL AGGREGATE BASIS.**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Coverage under this endorsement is subject to the following SCHEDULE:

## SECTION 1 – COMPUTER ATTACK

**Computer Attack Limit** .................................. $ 50,000
Annual Aggregate

**Sublimits**

    **Data Re-creation:** ................................. $ Excluded

    **Loss of Business:** ................................ $ Excluded

    **Public Relations:** .................................. $ Excluded
    .................................................... Per Occurrence

**Computer Attack Deductible:** ......................... $ 5,000
.................................................... Per Occurrence

## SECTION 2 – NETWORK SECURITY LIABILITY

**Network Security Liability Limit:** .................. $ 50,000
Annual Aggregate

**Network Security Liability Deductible:** .......... $ 5,000
Per Occurrence

**Network Security Liability Optional Coverage**
    **3rd Party Business Information:** ............ Excluded

The following is added as an Additional Coverage. If this is being endorsed onto a multi-section form, it is added to the Property section. This form may also be endorsed onto a Commercial General Liability or Farm Liability coverage form as a matter of convenience for policy issuance. In such a case, the coverage and service provided under this endorsement are separate from the Commercial General Liability or Farm Liability coverage. CyberOne Coverage includes reimbursement of specified legal expenses as well as defense and liability against certain claims, but such coverage is subject to

the Network Security Liability coverage limit. The limit and deductible applicable to CyberOne Coverage are separate from the limits and deductibles that apply to the coverage to which the endorsement attaches:

## SECTION 1 – COMPUTER ATTACK

### SECTION 1 – COVERED CAUSE OF LOSS

This Computer Attack coverage applies only if all of the following conditions are met:

1. There has been a "computer attack"; and

2. Such "computer attack" is first discovered by you during the policy period for which this endorsement is applicable; and

3. Such "computer attack" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first discovered by you.

### SECTION 1 – COVERAGES PROVIDED

If all three of the conditions listed above in SECTION 1 – COVERED CAUSE OF LOSS have been met, then we will provide you the following coverages for loss directly arising from such "computer attack".

1. **Data Restoration**

    We will pay your necessary and reasonable "data restoration costs".

2. **Data Re-creation**

    We will pay your necessary and reasonable "data re-creation costs".

3. **System Restoration**

    We will pay your necessary and reasonable "system restoration costs".

Includes copyrighted material of Insurance Services Office, Inc., with its permission
© 2013; as well as other copyrighted material

4. **Loss of Business**

We will pay your actual "business income loss" and your necessary and reasonable "extra expenses".

5. **Public Relations**

If you suffer a covered "business income loss", we will pay for the services of a professional public relations firm to assist you in communicating your response to the "computer attack" to the media, the public and your customers, clients or members.

## SECTION 1 – LIMITS

The most we will pay under Computer Attack coverage is the Computer Attack Limit indicated for this endorsement. If no limit is shown or is shown as Excluded on the SCHEDULE at the top of this endorsement, then the Computer Attack coverage will be considered to have a limit of $0.

The most we will pay under Data Re-creation coverage for loss (including "business income loss" and "extra expense" related to data re-creation activities) arising from any one "computer attack" is the Data Re-creation Sublimit indicated for this endorsement. This sublimit is part of, and not in addition to, the Computer Attack Limit. If no sublimit is shown or is shown as Excluded on the SCHEDULE at the top of this endorsement, then the Data Re-creation coverage will be considered to have a sublimit of $0.

The most we will pay under Loss of Business coverage for loss arising from any one "computer attack" is the Loss of Business Sublimit indicated for this endorsement. This sublimit is part of, and not in addition to, the Computer Attack Limit. If no sublimit is shown or is shown as Excluded on the SCHEDULE at the top of this endorsement, then the Loss of Business coverage will be considered to have a sublimit of $0.

The most we will pay under Public Relations coverage for loss arising from any one "computer attack" is the Public Relations Sublimit indicated for this endorsement. This sublimit is part of, and not in addition to, the Computer Attack Limit. If no sublimit is shown or is shown as Excluded on the SCHEDULE at the top of this endorsement, then the Public Relations coverage will be considered to have a sublimit of $0.

The Computer Attack Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under Section 1 arising out of all "computer attack" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "computer attack" events occurring during that period.

A "computer attack" may be first discovered by you in one policy period but it may cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "computer attack" will be subject to the Computer Attack Limit applicable to the policy period when the "computer attack" was first discovered by you.

## SECTION 1 – DEDUCTIBLE

The Computer Attack coverage is subject to the Computer Attack Deductible indicated in the SCHEDULE for this endorsement. You shall be responsible for the applicable deductible amount as respects loss arising from each "computer attack" covered under this endorsement.

## SECTION 2 – NETWORK SECURITY LIABILITY

## SECTION 2 – COVERED CAUSE OF LOSS

This Network Security Liability coverage applies only if all of the following conditions are met:

1. You first receive notice of a "network security liability suit" during the policy period for which this endorsement is applicable or any Extended Reporting Periods; and

2. Such "network security liability suit" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

## SECTION 2 – COVERAGES PROVIDED

If both of the conditions listed above in SECTION 2 – COVERED CAUSE OF LOSS have been met, then we will provide you the following coverages for loss directly arising from such "network security liability suit".

1. **Defense**

We will pay your necessary and reasonable "network security liability defense costs".

2. **Settlement Costs**

We will pay your necessary and reasonable "network security liability settlement costs".

## SECTION 2 – LIMITS

Except for post-judgment interest, the most we will pay under Network Security Liability coverage is the Network Security Liability Limit indicated for this endorsement. If no limit is shown or is shown as Excluded on the SCHEDULE at the top of this endorsement, then the Network Security Liability coverage will be considered to have a limit of $0.

The Network Security Liability Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under Section 2 (other than post-judgment interest) arising out of all "network security liability suits" of which you first receive notice during the present annual policy period or any Extended Reporting Periods. This limit applies regardless of the number of "network security liability suits" of which you first receive notice during that period.

You may first receive notice of a "network security liability suit" in one policy period but it may cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "network security liability suit" (other than post-judgment interest)

will be subject to the Network Security Liability Limit applicable to the policy period when notice of the "network security liability suit" was first received by you.

The Network Security Liability Limit for the Extended Reporting Periods (if applicable) shall be part of, and not in addition to, the Network Security Liability Limit for the immediately preceding policy period.

## SECTION 2 – DEDUCTIBLE

The Network Security Liability coverage is subject to the Network Security Liability Deductible indicated in the SCHEDULE for this endorsement. You shall be responsible for the applicable deductible amount as respects loss arising from each "network security liability suit" covered under this endorsement.

## EXCLUSIONS, ADDITIONAL CONDITIONS AND DEFINITIONS APPLICABLE TO ALL SECTIONS

## EXCLUSIONS

The following additional exclusions apply to this coverage:

We will not pay for costs or loss arising from the following:

1. Loss to the internet, an internet service provider, or any computer or computer system that is not owned or leased by you and operated under your control.

2. Costs to research or correct any deficiency.

3. Any fines or penalties.

4. Any criminal investigations or proceedings.

5. Any threat, extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

6. Your intentional or willful complicity in a covered loss event or your reckless disregard for the security of your computer system or data.

7. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you.

8. Any "computer attack" occurring prior to the first inception of this CyberOne coverage endorsement or any coverage substantially similar to that described in this endorsement.

9. That part of any "network security liability suit" seeking any non-monetary relief.

10. Any "network security liability suit" arising from a propagation of malware, denial of service attack, or if applicable, loss, release or disclosure of business data that occurred prior to the first inception of this CyberOne coverage endorsement or any coverage substantially similar to that described in this endorsement.

11. The propagation or forwarding of malware, including viruses, worms, Trojans, spyware and keyloggers in connection with hardware or software created, produced or modified by you for sale, lease or license to third parties.

## ADDITIONAL CONDITIONS

The following additional conditions apply to all coverages under this endorsement.

1. **Due Diligence**

   You agree to use due diligence to prevent and mitigate costs covered under this endorsement. This includes, but is not limited to, complying with reasonable and industry-accepted protocols for:

   a. Providing and maintaining appropriate computer and internet security; and

   b. Maintaining and updating at appropriate intervals backups of computer data.

2. **Duties in the Event of a "Network Security Liability Suit"**

   a. If a "network security liability suit" is brought against you, you must:

      (1) Immediately record the specifics of the "network security liability suit" and the date received; and

      (2) Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "network security liability suit" is first received by you.

      (3) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "network security liability suit";

      (4) Authorize us to obtain records and other information;

      (5) Cooperate with us in the investigation, settlement or defense of the "network security liability suit";

      (6) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

      (7) Not take any action, or fail to take any required action, that prejudices your rights or our rights with respect to such "network security liability suit".

3. **Extended Reporting Periods**

   a. You shall have the right to the Extended Reporting Periods described in this section, in the event that:

      (1) You or we cancel this CyberOne coverage;

      (2) You or we refuse to renew this CyberOne coverage; or

(3) We renew this CyberOne coverage on an other than a claims-made basis or with a retroactive date later than the date of the first inception of this CyberOne coverage endorsement or any coverage substantially similar to that described in this endorsement;

b.  If an event as specified in Paragraph a. has occurred, you shall have the right to the following:

(1) An Automatic Extended Reporting Period of 30 days after the effective date of cancellation or nonrenewal at no additional premium in which to give to us written notice of a "network security liability suit" of which you first receive notice during said Automatic Extended Reporting Period for any propagation of malware, denial of service attack, or if applicable, loss, release or disclosure of business data occurring before the end of the coverage period for this CyberOne coverage and which is otherwise covered by this CyberOne coverage; and

(2) Upon payment of an additional premium of 100% of the full annual premium applicable to this CyberOne coverage, a Supplemental Extended Reporting Period of 1 year immediately following the effective date of cancellation or nonrenewal in which to give to us written notice of a "network security liability suit" of which you first receive notice during said Supplemental Extended Reporting Period for any propagation of malware, denial of service attack, or if applicable, loss, release or disclosure of business data occurring before the end of the coverage period for this CyberOne coverage and which is otherwise covered by this CyberOne coverage.

To obtain the Supplemental Extended Reporting Period, you must request it in writing and pay the additional premium due, within 30 days of the effective date of cancellation or nonrenewal. The additional premium for the Supplemental Extended Reporting Period shall be fully earned at the inception of the Supplemental Extended Reporting Period. If we do not receive the written request as required, you may not exercise this right at a later date.

This insurance, provided during the Supplemental Extended Reporting Period, is excess over any other valid and collectible insurance that begins or continues in effect after the Supplemental Extended Reporting Period becomes effective, whether the other insurance applies on a primary, excess, contingent, or any other basis.

4.  **Network Security Liability Defense**

a.  We shall have the right and the duty to assume the defense of any applicable "network security liability suit" against you. You shall give us such information and cooperation as we may reasonably require.

b.  You shall not admit liability for or settle any "network security liability suit" or incur any defense costs without our prior written consent.

c.  If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense by tendering control of the defense to you. From that point forward, you shall, at your own expense, negotiate or defend such "network security liability suit" independently of us. Our liability shall not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

d.  We shall not be obligated to pay any damages or defense costs, or to defend or continue to defend any "network security liability suit", after the Network Security Liability Limit has been exhausted.

e.  We shall pay all interest on that amount of any judgment within the Network Security Liability Limit which accrues:

(1) After entry of judgment; and

(2) Before we pay, offer to pay or deposit in court that part of the judgment within the Network Security Liability Limit or, in any case, before we pay or offer to pay the entire Network Security Liability Limit.

These interest payments shall be in addition to and not part of the Network Security Liability Limit.

5.  **Other Data Coverage in This Policy**

Some elements of this CyberOne coverage may also be covered under the policy to which this endorsement is attached. If so, this CyberOne coverage will apply as excess, additional coverage. If loss payment has been made under the policy for the same event, the amount of such payment will count towards the deductible that applies to this CyberOne coverage.

6.  **Services**

The following conditions apply as respects any services provided to you by any service firm provided or paid for in whole or in part under this endorsement:

a.  The effectiveness of such services depends on your cooperation and assistance.

b. We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

## DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

1. "Business Income Loss" means the sum of the:

   a. Net income (net profit or loss before income taxes) that would have been earned or incurred; and

   b. Continuing normal and necessary operating expenses incurred, including employee payroll,

   actually lost by you during the "period of restoration".

2. "Computer Attack" means one of the following involving a computer or other electronic hardware that is owned or leased by you and operated under your control:

   a. Unauthorized Access – meaning the gaining of access to your computer system by an unauthorized person or persons; or

   b. Malware Attack – meaning damage to your computer system or data arising from malicious code, including viruses, worms, Trojans, spyware and keyloggers. This does not mean damage from shortcomings or mistakes in legitimate electronic code or damage from code installed on your computer system during the manufacturing process.

   c. Denial of Service Attack – meaning a deliberate act to prevent third parties from gaining access to your computer system through the internet in a manner in which they are legally entitled.

3. "Data Re-creation Costs"

   a. "Data re-creation costs" means the costs of an outside professional firm hired by you to research, re-create and replace data that has been lost or corrupted and for which there is no electronic source available or where the electronic source does not have the same or similar functionality to the data that has been lost or corrupted.

   b. "Data re-creation costs" also means your actual "business income loss" and your necessary and reasonable "extra expenses" arising from the lack of the lost or corrupted data during the time required to research, re-create and replace such data.

   c. "Data re-creation costs" does not mean costs to research, re-create or replace:

      (1) Software programs or operating systems that are not commercially available; or

      (2) Data that is obsolete, unnecessary or useless to you.

4. "Data Restoration Costs"

   a. "Data restoration costs" means the costs of an outside professional firm hired by you to replace electronic data that has been lost or corrupted. In order to be considered "data restoration costs," such replacement must be from one or more electronic sources with the same or similar functionality to the data that has been lost or corrupted.

   b. "Data restoration costs" does not mean costs to research, restore or replace:

      (1) Software programs or operating systems that are not commercially available; or

      (2) Data that is obsolete, unnecessary or useless to you.

5. "Extra Expense" means the additional cost you incur to operate your business during the "period of restoration" over and above the cost that you normally would have incurred to operate your business during the same period had no "computer attack" occurred.

6. "Network Security Liability Defense Costs"

   a. "Network security liability defense costs" means reasonable and necessary expenses resulting solely from the investigation, defense and appeal of any "network security liability suit" against you. Such expenses may be incurred by us. Such expenses may include premiums for any appeal bond, attachment bond or similar bond. However, we have no obligation to apply for or furnish such bond.

   b. "Network security liability defense costs" does not mean your salaries or your loss of earnings.

7. "Network Security Liability Settlement Costs"

   a. "Network security liability settlement costs" means the following, when they arise from a "network security liability suit":

      (1) Damages, judgments or settlements; and

      (2) Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or court order; and

      (3) Pre-judgment interest on that part of any judgment paid by us.

   b. "Network security liability settlement costs" does not mean:

      (1) Civil or criminal fines or penalties imposed by law;

      (2) Punitive or exemplary damages;

      (3) The multiplied portion of multiplied damages;

      (4) Taxes; or

      (5) Matters which may be deemed uninsurable under the applicable law.

8. "Network Security Liability Suit"

a. "Network security liability suit" means a civil proceeding against you in which damages are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. Such proceeding must be based on an allegation that a negligent security failure or weakness with respect to a computer or other electronic hardware that is owned or leased by you and operated under your control allowed one or more of the following to happen:

(1) The unintended propagation or forwarding of malware, including viruses, worms, Trojans, spyware and keyloggers. Malware does not include shortcomings or mistakes in legitimate electronic code.

(2) The unintended abetting of a denial of service attack against one or more other systems.

b. If the 3rd Party Business Information line under Network Security Liability Optional Coverage on the SCHEDULE at the top of this endorsement is marked as Included, then "network security liability suit" also means a civil proceeding against you in which damages are alleged which is brought in the United States of America, Puerto Rico or Canada and which is based on an allegation that a negligent security failure or weakness with respect to a computer or other electronic hardware that is owned or leased by you and operated under your control allowed the loss, release or disclosure of business data that is owned by or proprietary to a third party. This does not include personally identifying information or other information that is sensitive or personal to individuals. If the 3rd Party Business Information line under Network Security Liability Optional Coverage on the SCHEDULE at the top of this endorsement is marked as Excluded or is blank, then "network security liability suit" does not include such suits.

c. "Network security liability suit" includes the following:

(1) An arbitration or alternative dispute resolution proceeding that you are required to submit to or which we agree you should submit to; or

(2) A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

d. "Network security liability suit" does not mean any demand or action alleging or arising from property damage or bodily injury.

e. "Network security liability suit" does not mean any demand or action brought by or on behalf of someone who is:

(1) Your director or officer;

(2) Your owner or part-owner; or

(3) A holder of your securities;

in their capacity as such, whether directly, derivatively, or by class action.

9. "Period of Restoration" means the period of time that begins at the time that the "computer attack" is discovered by you and continues until the earlier of:

a. The date that all data restoration, data re-creation and system restoration directly related to the "computer attack" has been completed; or

b. The date on which such data restoration, data re-creation and system restoration could have been completed with the exercise of due diligence and dispatch.

10. "System Restoration Costs"

a. "System restoration costs" means the costs of an outside professional firm hired by you to do any of the following in order to restore your computer system to its pre- "computer attack" level of functionality:

(1) Replace or reinstall computer software programs;

(2) Remove any malicious code; and

(3) Configure or correct the configuration of your computer system.

b. "System restoration costs" does not mean:

(1) Costs to increase the speed, capacity or utility of your computer system;

(2) Labor of your employees;

(3) Any costs in excess of the actual cash value of your computer system; or

(4) Costs to repair or replace hardware.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
© 2013; as well as other copyrighted material



**OREGON MUTUAL INSURANCE COMPANY**
**DATA COMPROMISE COVERAGE**
**RESPONSE EXPENSES AND DEFENSE AND LIABILITY**

M2872 (4-15)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Coverage under this endorsement is subject to the following:

## SECTION 1 – RESPONSE EXPENSES

**Data Compromise**
**Response Expenses Limit:** ..........................$ 50,000
Annual Aggregate

**Sublimits**

> **Named Malware (Sec. 1):**..........................$ 50,000
> **Forensic IT Review:**................................$   5,000
> **Legal Review:** .........................................$   5,000
> **PR Services:** ...........................................$   5,000
> Any one "Personal Data Compromise"

**Response Expenses Deductible:**.................$   1,000
Any one "Personal Data Compromise"

## SECTION 2 – DEFENSE AND LIABILITY

**Data Compromise**
**Defense and Liability Limit:** ..........................$ 50,000
Annual Aggregate

**Sublimits**

> **Named Malware (Sec. 2):**..........................$ 50,000
> Any one "Personal Data Compromise"
> **Defense and Liability Deductible:**...........$   1,000
> Each "Data Compromise Suit"

The following is added as an Additional Coverage. If this is being endorsed onto a multi-section form, it is added to the Property section. This form may also be endorsed onto a Commercial General Liability or Farm Liability coverage form as a matter of convenience for policy issuance. In such a case, the coverage and service provided under this endorsement are separate from the Commercial General Liability or Farm Liability coverage. Data Compromise Coverage includes reimbursement of specified legal expenses as well as defense and liability against certain claims, but such coverage is subject to the Data Compromise coverage limit. The limit and deductible applicable to Data Compromise Coverage are separate from the limits and deductibles that apply to the coverage to which the endorsement attaches.

## SECTION 1 – RESPONSE EXPENSES

## DATA COMPROMISE COVERED CAUSE OF LOSS

Coverage under this Data Compromise Coverage endorsement applies only if all of the following conditions are met:

1. There has been a "personal data compromise"; and

2. Such "personal data compromise" is first discovered by you during the policy period for which this Data Compromise Coverage endorsement is applicable; and

3. Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

## COVERAGE – SECTION 1

If the three conditions listed above in DATA COMPROMISE – COVERED CAUSE OF LOSS have been met, then we will provide coverage for the following expenses when they arise directly from the covered cause of loss and are necessary and reasonable. Coverages 4 and 5 apply only if there has been a notification of the "personal data compromise" to "affected individuals" as covered under coverage 3.

1. **Forensic IT Review**

   Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals".

   This does not include costs to analyze, research or determine any of the following:

   **a.** Vulnerabilities in systems, procedures or physical security;

   **b.** Compliance with PCI or other industry security standards; or

   **c.** The nature or extent of loss or damage to data that is not "personally identifying information" or "personally sensitive information".

If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Forensic IT Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

2. **Legal Review**

   Professional legal counsel review of the "personal data compromise" and how you should best respond to it.

   If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Legal Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

**3. Notification to Affected Individuals**

We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals".

**4. Services to Affected Individuals**

We will pay your necessary and reasonable costs to provide the following services to "affected individuals".

**a.** The following services apply to any "personal data compromise".

(1) Informational Materials

A packet of loss prevention and customer support information.

(2) Help Line

A toll-free telephone line for "affected individuals" with questions about the "personal data compromise". Where applicable, the line can also be used to request additional services as listed in b.(1) and (2).

**b.** The following additional services apply to "personal data compromise" events involving "personally identifying information".

(1) Credit Report and Monitoring

A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This service is subject to the "affected individual" enrolling for this service with the designated service provider.

(2) Identity Restoration Case Management

As respects any "affected individual" who is or appears to be a victim of "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

**5. PR Services**

Professional public relations firm review of and response to the potential impact of the "personal data compromise" on your business relationships.

This includes costs to implement public relations recommendations of such firm. This may include advertising and special promotions designed to retain your relationship with "affected individuals". However, we will not pay for promotions:

**a.** Provided to any of your directors or employees; or;

**b.** Costing more than $25 per "affected individual".

**LIMITS – SECTION 1**

The most we will pay under Response Expenses coverage is the Data Compromise Response Expenses Limit indicated for this endorsement.

The Data Compromise Response Expenses Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under Section 1 arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Response Expenses Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

The most we will pay under Response Expenses coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 1) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 1) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise". This sublimit is part of, and not in addition to the Data Compromise Response Expenses Limit.

The most we will pay under Forensic IT Review, Legal Review and PR Services coverages for loss arising from any one "personal data compromise" is the applicable sublimit for each of those coverages indicated for this endorsement. These sublimits are part of, and not in addition to, the Data Compromise Response Expenses Limit. PR Services coverage is also subject to a limit per "affected individual" as described in 5. PR Services.

Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals". Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

**DEDUCTIBLE – SECTION 1**

Response Expenses coverage is subject to the Response Expenses Deductible indicated for this endorsement. You shall be responsible for such deductible amount as respects each "personal data compromise" covered under this endorsement.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
© 2006, 2009, 2012; as well as other copyrighted material

T81622.FRM

The following is added as an Additional Coverage:

## SECTION 2 – DEFENSE AND LIABILITY

### DEFENSE AND LIABILITY COVERED CAUSE OF LOSS

Coverage under this Data Compromise Coverage endorsement applies only if all three of the conditions in DATA COMPROMISE – COVERED CAUSE OF LOSS are met.

Only with regard to Section 2 – Defense and Liability coverage, the following conditions must also be met:

1. You have provided notifications and services to "affected individuals" in consultation with us pursuant to Response Expenses coverage; and

2. You receive notice of a "data compromise suit" brought by one or more "affected individuals" or by a governmental entity on behalf of one or more "affected individuals"; and

3. Notice of such "data compromise suit" is received by you within two years of the date that the "affected individuals" are notified of the "personal data compromise"; and

4. Such "data compromise suit" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

### COVERAGE – SECTION 2

If all of the conditions listed above in DEFENSE AND LIABILITY – COVERED CAUSE OF LOSS have been met, then we will provide coverage for "data compromise defense costs" and "data compromise liability" directly arising from the covered cause of loss.

### LIMITS – SECTION 2

The most we will pay under Defense and Liability coverage is the Data Compromise Defense and Liability Limit indicated for this endorsement.

The Data Compromise Defense and Liability Limit is an annual aggregate limit. This amount is the most we will pay for all loss covered under Section 2 (other than post-judgment interest) arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs (other than post-judgment interest) arising from such "personal data compromise" will be subject to the Data Compromise Defense and Liability Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

The most we will pay under Defense and Liability coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 2) sublimit

indicated for this endorsement. For the purpose of the Named Malware (Sec. 2) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise". This sublimit is part of, and not in addition to, the Defense and Liability Limit.

### DEDUCTIBLE – SECTION 2

Defense and Liability coverage is subject to the Defense and Liability Deductible indicated for this endorsement. You shall be responsible for such deductible amount as respects each "data compromise suit" covered under this endorsement.

## EXCLUSIONS, ADDITIONAL CONDITIONS AND DEFINITIONS APPLICABLE TO BOTH SECTION 1 AND SECTION 2

### EXCLUSIONS

The following additional exclusions apply to this coverage:

We will not pay for costs arising from the following:

1. Your intentional or willful complicity in a "personal data compromise".

2. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you.

3. Any "personal data compromise" occurring prior to the date that this Data Compromise Coverage endorsement, or any coverage substantially similar to that described in this endorsement, was first added to this policy.

4. Costs to research or correct any deficiency. This includes, but is not limited to, any deficiency in your systems, procedures or physical security that may have contributed to a "personal data compromise".

5. Any fines or penalties. This includes, but is not limited to, fees or surcharges from affected financial institutions.

6. Any criminal investigations or proceedings.

7. Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

8. Any "personal data compromise" involving data that is being transmitted electronically, unless such data is encrypted to protect the security of the transmission.

9. Your reckless disregard for the security of "personally identifying information" or "personally sensitive information" in your care, custody or control.

10. That part of any "data compromise suit" seeking any non-monetary relief.

**ADDITIONAL CONDITIONS**

The following Additional Conditions apply to all coverages under this endorsement.

**1. Data Compromise Liability Defense**

    **a.** We shall have the right and the duty to assume the defense of any applicable "data compromise suit" against you. You shall give us such information and cooperation as we may reasonably require.

    **b.** You shall not admit liability for or settle any "data compromise suit" or incur any defense costs without our prior written consent.

    **c.** If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense by tendering control of the defense to you. From that point forward, you shall, at your own expense, negotiate or defend such "data compromise suit" independently of us. Our liability shall not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

    **d.** We shall not be obligated to pay any damages or defense costs, or to defend or continue to defend any "data compromise suit", after the Data Compromise Defense and Liability Limit has been exhausted.

    **e.** We shall pay all interest on that amount of any judgment within the Data Compromise Defense and Liability Limit which accrues:

        **(1)** After entry of judgment; and

        **(2)** Before we pay, offer to pay or deposit in court that part of the judgment within the Data Compromise Defense and Liability Limit or, in any case, before we pay or offer to pay the entire Data Compromise Defense and Liability Limit.

    These interest payments shall be in addition to and not part of the Data Compromise Defense and Liability Limit.

**2. Duties in the Event of a "Data Compromise Suit"**

    **a.** If a "data compromise suit" is brought against you, you must:

        **(1)** Immediately record the specifics of the "data compromise suit" and the date received; and

        **(2)** Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "data compromise suit" is first received by you.

        **(3)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "data compromise suit";

        **(4)** Authorize us to obtain records and other information;

        **(5)** Cooperate with us in the investigation, settlement or defense of the "data compromise suit";

        **(6)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

        **(7)** Not take any action, or fail to take any required action, that prejudices your rights or our rights with respect to such "data compromise suit".

    **b.** You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

    **c.** If you become aware of a claim or complaint that may become a "data compromise suit", you shall promptly inform us of such claim or complaint.

**3. Due Diligence**

You agree to use due diligence to prevent and mitigate costs covered under this endorsement. This includes, but is not limited to, complying with, and requiring your vendors to comply with, reasonable and industry-accepted protocols for:

    **a.** Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

    **b.** Providing and maintaining appropriate computer and Internet security;

    **c.** Maintaining and updating at appropriate intervals backups of computer data;

    **d.** Protecting transactions, such as processing credit card, debit card and check payments; and

    **e.** Appropriate disposal of files containing "personally identifying information" or "personally sensitive information", including shredding hard copy files and destroying physical media used to store electronic data.

**4. Legal Advice**

We are not your legal advisor. Our determination of what is or is not covered under this Data Compromise Coverage endorsement does not represent advice or counsel from us about what you should or should not do.

**5. Pre-Notification Consultation**

You agree to consult with us prior to the issuance of notification to "affected individuals". We assume no responsibility under this Data Compromise Coverage for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Additional Condition 6. Service Providers. You must provide the following at our pre-notification consultation with you:

**a.** The exact list of "affected individuals" to be notified, including contact information.

**b.** Information about the "personal data compromise" that may appropriately be communicated with "affected individuals".

**c.** The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Response Expenses Limit.

**6. Service Providers**

**a.** We will only pay under this Data Compromise Coverage for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Data Compromise Coverage. We will not unreasonably withhold such approval.

**b.** Prior to the Pre-Notification Consultation described in Additional Condition 5. above, you must come to agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals. We will suggest a service provider. If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

**(1)** Such alternate service provider must be approved by us;

**(2)** Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

**(3)** Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

**7. Services**

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Data Compromise coverage:

**a.** The effectiveness of such services depends on your cooperation and assistance.

**b.** All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

**c.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

**d.** You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you.

## DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

**1.** "Affected Individual" means any person who is your current, former or prospective customer, client, member, owner, director or employee and whose "personally identifying information" or "personally sensitive information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this endorsement. This definition is subject to the following provisions:

**a.** "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

**b.** An "affected individual" must have a direct relationship with your interests as insured under this policy. The following are examples of individuals who would not meet this requirement:

**(1)** If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

**(2)** If you store, process, transmit or transport records, the individuals whose "personally identifying information" or "personally sensitive information" you are storing, processing, transmitting or transporting for another entity do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

(3) You may have operations, interests or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of the operation insured under this policy.

c. An "affected individual" may reside anywhere in the world.

2. "Data Compromise Defense Costs" means expenses resulting solely from the investigation, defense and appeal of any "data compromise suit" against you. Such expenses must be reasonable and necessary. They will be incurred by us. They do not include your salaries or your loss of earnings. They do include premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond.

3. "Data Compromise Liability"

a. "Data compromise liability" means the following, when they arise from a "data compromise suit":

(1) Damages, judgments or settlements to "affected individuals";

(2) Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or court order; and

(3) Pre-judgment interest on that part of any judgment paid by us.

b. "Data compromise liability" does not mean:

(1) Damages, judgments or settlements to anyone who is not an "affected individual";

(2) Civil or criminal fines or penalties imposed by law;

(3) Punitive or exemplary damages;

(4) The multiplied portion of multiplied damages;

(5) Taxes; or

(6) Matters which may be deemed uninsurable under the applicable law.

4. "Data Compromise Suit"

a. "Data Compromise Suit" means a civil proceeding in which damages to one or more "affected individuals" arising from a "personal data compromise" or the violation of a governmental statute or regulation are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. "Data compromise suit" includes:

(1) An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent;

(2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent; or

(3) A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

b. "Data compromise suit" does not mean any demand or action brought by or on behalf of someone who is:

(1) Your director or officer;

(2) Your owner or part-owner; or

(3) A holder of your securities;

in their capacity as such, whether directly, derivatively, or by class action. "Data compromise suit" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual".

c. "Data compromise suit" does not mean any demand or action brought by an organization, business, institution, or any other party that is not an "affected individual" or governmental entity. "Data compromise suit" does not mean any demand or action brought on behalf of an organization, business, institution, governmental entity or any other party that is not an "affected individual".

5. "Identity Theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

6. "Malware-Related Compromise" means a "personal data compromise" that is caused, enabled or abetted by a virus or other malicious code that, at the time of the "personal data compromise", is named and recognized by the CERT® Coordination Center, McAfee®, Secunia, Symantec or other comparable third party monitors of malicious code activity.

7. "Personal Data Compromise" means the loss, theft, accidental release or accidental publication of "personally identifying information" or "personally sensitive information" as respects one or more "affected individuals". If the loss, theft, accidental release or accidental publication involves "personally identifying information", such loss, theft, accidental release or accidental publication must result in or have the reasonable possibility of resulting in the fraudulent use of such information. This definition is subject to the following provisions:

a. At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" or "personally sensitive information" need not be at the insured premises but must be in the direct care, custody or control of:

   (1) You; or

   (2) A professional entity with which you have a direct relationship and to which you (or an "affected individual" at your direction) have turned over (directly or via a professional transmission or transportation provider) such information for storage, processing, transmission or transportation of such information.

b. "Personal data compromise" includes disposal or abandonment of "personally identifying information" or "personally sensitive information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

   (1) The failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

   (2) Such disposal or abandonment must take place during the time period for which this Data Compromise Coverage endorsement is effective.

c. "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" or "personally sensitive information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof.

d. All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise".

8. "Personally Identifying Information" means information, including health information, that could be used to commit fraud or other illegal activity involving the credit, access to health care or identity of an "affected individual". This includes, but is not limited to, Social Security numbers or account numbers.

   "Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

9. "Personally Sensitive Information" means private information specific to an individual the release of which requires notification of "affected individuals" under any applicable law.

   "Personally sensitive information" does not mean or include "personally identifying information".

All other provisions of this policy apply.



**OREGON MUTUAL INSURANCE COMPANY**
**BUSINESSOWNERS**
**TENANT'S IMPROVEMENTS AND BETTERMENTS**
**INCLUDED AS BUILDING**

M2428B (1-06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| Prem. No. | Bldg. No. | Additional Building Property |
|-----------|-----------|------------------------------|
| 1 | 1 | TENANTS IMPROVEMENTS AND BETTERMENTS |

Property described in the schedule is added to Building Covered Property, under **Section I - Property**, paragraph **A.1.a**.

Property described in the following schedule is not covered under Business Personal Property; under **Section I - Property**, paragraph **A.1.b**.